Filed on behalf of Senior Party
THE REGENTS OF THE UNIVERSITY OF CALIFORNIA,
UNIVERSITY OF VIENNA, AND EMMANUELLE CHARPENTIER

By:   Todd R. Walters, Esq.
       Erin M. Dunston, Esq.
       Travis W. Bliss, Ph.D., Esq.
       Christopher L. North, Ph.D., Esq.
       BUCHANAN INGERSOLL & ROONEY PC
       1737 King Street, Suite 500
       Alexandria, Virginia 22314-2727
       Telephone (703) 836-6620
       Facsimile (703) 836-2021
       todd.walters@bipc.com
       erin.dunston@bipc.com
       travis.bliss@bipc.com
       christopher.north@bipc.com

By: Li-Hsien Rin-Laures, M.D., Esq.
    Sandip H. Patel, Esq.
    Greta Noland
    MARSHALL GERSTEIN & BORUN LLP
    6300 Willis Tower
    233 South Wacker Drive
    Chicago, Illinois 60606
    Telephone (312) 474-6300
    Facsimile (312) 474-0448
    lrinlaures@marshallip.com
    spatel@marshallip.com
    gnoland@marshallip.com

UNITED STATES PATENT AND TRADEMARK OFFICE

—————————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

—————————————

**THE BROAD INSTITUTE, INC.**, MASSACHUSETTS INSTITUTE OF
TECHNOLOGY, and PRESIDENT AND FELLOWS OF HARVARD COLLEGE
Patents 8,697,359; 8,771,945; 8,795,965; 8,865,406; 8,871,445; 8,889,356;
8,895,308; 8,906,616; 8,932,814; 8,945,839; 8,993,233; 8,999,641; and Application 14/704,551,

**Junior Party,**

v.

**THE REGENTS OF THE UNIVERSITY OF CALIFORNIA**, UNIVERSITY
OF VIENNA, AND EMMANUELLE CHARPENTIER,
Application 13/842,859,

**Senior Party.**

—————————————

Patent Interference 106,048 (DK)

—————————————

**SENIOR PARTY NOTICE OF APPEAL**

Pursuant to 35 U.S.C. §§ 141 (pre-AIA) and 142, 37 C.F.R. § 90.1, and 37 C.F.R. §§ 1.301, 1.302, and 1.304 (effective as of July 1, 2012), THE REGENTS OF THE UNIVERSITY OF CALIFORNIA, UNIVERSITY OF VIENNA, AND EMMANUELLE CHARPENTIER, hereby appeal to the United States Court of Appeals for the Federal Circuit for review of the following Decisions and Orders of the U.S. Patent and Trademark Office Patent Trial and Appeal Board in Patent Interference No. 106,048:

(1) Decision on Motions – 37 C.F.R. § 41.125(a), dated February 15, 2017 (Paper 893) (Exhibit A);

(2) Judgment – 37 C.F.R. § 41.127(a), dated February 15, 2017 (Paper 894) (Exhibit B);

(3) Order – Late Submission of Evidence – 37 C.F.R. § 41.104(a), dated January 3, 2017 (Paper 891) (Exhibit C);

(4) Order – Additional Discovery and New Evidence in Reply – 37 C.F.R. § 41.150(c) and Standing Order ¶ 122.6, dated September 14, 2016 (Paper 801) and Errata to Order, dated September 20, 2016 (Paper 803) (Exhibit D);

(5) Order – 37 C.F.R. § 41.104(a), dated September 1, 2016 (Paper 794) (Exhibit E);

(6) Decision on Request for Rehearing of Order Authorizing Motions – 37 C.F.R. § 41.125(c), dated April 15, 2016 (Paper 42) (Exhibit F);

(7) Order Authorizing Motions and Setting Times – 37 C.F.R. § 121, dated March 17, 2016 (Paper 33) (Exhibit G); and

(8) all underlying orders, decisions, rulings, and opinions.

This Notice of Appeal is being filed with (1) the Director of the United States Patent and Trademark Office, (2) the Patent Trial and Appeal Board via the Interference Web Portal, and (3)

the Clerk of the United States Court of Appeals for the Federal Circuit along with the requisite

appeal fee.

Respectfully submitted,


Date:  April 12, 2017                    By:    /Todd R. Walters/
                                                Todd R. Walters, Esq.
                                                Registration No. 34,040
                                                BUCHANAN INGERSOLL & ROONEY PC
                                                1737 King Street, Suite 500
                                                Alexandria, VA 22314
                                                Telephone (703) 836-6620
                                                Facsimile (703) 836-2021
                                                todd.walters@bipc.com
                                                *Counsel for UC and Vienna*


Date:  April 12, 2017                    By:    / Sandip H. Patel /
                                                Sandip H. Patel, Esq.
                                                Registration No. 43,848
                                                MARSHALL GERSTEIN & BORUN LLP
                                                6300 Willis Tower
                                                233 South Wacker Drive
                                                Chicago, Illinois 60606
                                                Telephone (312) 474-6300
                                                Facsimile (312) 474-0448
                                                spatel@marshallip.com
                                                *Counsel for EC*

<u>CERTIFICATE OF FILING AND SERVICE</u>

I hereby certify that on this 12th day of April, 2017, the foregoing **SENIOR PARTY**

**NOTICE OF APPEAL** is being filed by hand delivery to:

      Director of the United States Patent and Trademark Office
      c/o Office of the General Counsel, Room 10B20
      Madison Building East
      600 Dulany Street
      Alexandria, Virginia

and copies are being filed:

      (1) via the Interference Web Portal with the Patent Trial and Appeal Board; and

      (2) via CM/ECF (with the fee) with the Clerk's Office of the United States Court of

Appeals for the Federal Circuit.

      I hereby certify that a copy will be served by Priority Mail Express and electronically on

counsel for Junior Party as follows:

| | |
|---|---|
| Steven R. Trybus, Esq. | Raymond N. Nimrod |
| Harry J. Roper, Esq. | Quinn Emanuel Urquhart & Sullivan, LLP |
| Paul D. Margolis, Esq. | 51 Madison Avenue, 22nd Floor |
| JENNER & BLOCK LLP | New York, New York 10010 |
| 353 North Clark Street | (212) 849-7000 |
| Chicago, Illinois 60654 | raynimrod@quinnemanuel.com |
| (312) 222-9350 | |
| strybus@jenner.com | |
| hroper@jenner.com | |
| pmargolis@jenner.com | |

           /Todd R. Walters/
           Todd R. Walters, Esq.
           BUCHANAN INGERSOLL & ROONEY PC
           1737 King Street, Suite 500
           Alexandria, VA 22314
           Telephone (703) 836-6620
           Facsimile (703) 836-2021
           todd.walters@bipc.com

           *Counsel for UC and Vienna*

# EXHIBIT A

BoxInterferences@uspto.gov                                    Filed: February 15, 2017
Tel: 571-272- 7822

UNITED STATES PATENT AND TRADEMARK OFFICE
————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD
————————

**THE BROAD INSTITUTE, INC.**, MASSACHUSETTS INSTITUTE
OF TECHNOLOGY, and PRESIDENT AND
FELLOWS OF HARVARD COLLEGE,
(Patents 8,697,359; 8,771,945; 8,795,965; 8,865,406; 8,871,445; 8,889,356;
8,895,308; 8,906,616; 8,932,814; 8,945,839; 8,993,233; 8,999,641
and Application 14/704,551),

**Junior Party**,

v.

**THE REGENTS OF THE UNIVERSITY OF CALIFORNIA**,
UNIVERSITY OF VIENNA, and EMMANUELLE CHARPENTIER
(Application 13/842,859),

**Senior Party.**

Patent Interference No. 106,048 (DK)

————————

**DECISION ON MOTIONS**
37 C.F.R. § 41.125(a)

Before RICHARD E. SCHAFER, SALLY GARDNER LANE, and
DEBORAH KATZ, *Administrative Patent Judges*.

*Per curiam.*

Interference 106,048

1    *I.    Summary*

2    Broad has persuaded us that the parties claim patentably distinct subject

3    matter, rebutting the presumption created by declaration of this interference.

4    Broad provided sufficient evidence to show that its claims, which are all limited to

5    CRISPR-Cas9 systems in a eukaryotic environment, are not drawn to the same

6    invention as UC's claims, which are all directed to CRISPR-Cas9 systems not

7    restricted to any environment. Specifically, the evidence shows that the invention

8    of such systems in eukaryotic cells would not have been obvious over the invention

9    of CRISPR-Cas9 systems in any environment, including in prokaryotic cells or *in*

10   *vitro*, because one of ordinary skill in the art would not have reasonably expected a

11   CRISPR-Cas9 system to be successful in a eukaryotic environment. This evidence

12   shows that the parties' claims do not interfere. Accordingly, we terminate the

13   interference.

14

15   *II.    Introduction*

16                                    A.

17   A CRISPR-Cas9[1] system is a combination of protein and ribonucleic acid

18   ("RNA") that can alter the genetic sequence of an organism. In their natural

19   environment, CRISPR-Cas systems protect bacteria against infection by viruses.

20   (Simons Decl., Exh. 2001, at ¶ 2.1; Greider Decl., Exh. 1022, at ¶ 51.) The

---

[1] "CRISPR-Cas" is an acronym for Clustered Regularly Interspaced Short
Palindromic Repeats (CRISPR)-CRISPR associated (Cas) system. (*See* UC
involved application 13/842,859, Exh. 1001, at ¶ 4; Broad involved patent
8,697,359, Exh. 1007, at 1:45-46.)

-2-

Interference 106,048

1  CRISPR-Cas9 system is now being developed as a powerful tool to modify

2  specific deoxyribonucleic acid ("DNA") in the genomes of other organisms, from

3  plants to animals.  "With CRISPR, scientists can create mouse models of human

4  diseases much more quickly than before, study individual genes much faster, and

5  easily change multiple genes in cells at once to study their interactions."  (Pennisi,

6  Exh. 2231[2], at 834.)

7         Both parties claim CRISPR-Cas9 systems and methods of using them,

8  though none of their claims are identical.  Senior Party, the Regents of the

9  University of California, University of Vienna, and Emmanuelle Charpentier

10  (collectively "UC"), suggested this interference between its involved application

11  and multiple patents issued to Senior Party, the Broad Institute, Inc., Massachusetts

12  Institute of Technology, and President and Fellows of Harvard College

13  (collectively "Broad").  (*See* Application 13/842,859, Suggestion for Interference

14  Pursuant to 37 C.F.R. § 41.202, filed 13 April 2015; *see* Appendix.)  The

15  interference was declared based in part on the representations made by UC during

16  *ex parte* prosecution of its involved application.

17         When the interference was declared, all of the claims of UC's involved

18  application and all of the claims of each of Broad's involved patents were

19  designated as corresponding to Count 1, the single count of the interference.  (*See*

20  Declaration, Paper 1.)  The interference was later redeclared to add Broad

21  application 14/704,551, which was found by the examiner to contain allowable

---

[2] Pennisi, 341 Science 833-836 (2013) (Exh. 2231).

-3-

Interference 106,048

1    subject matter after the declaration of this interference.  (Redeclaration, Paper 32;

2    *see* Order Authorizing Motions and Setting Times, Paper 33, at 13:9-12.)

3                                                    B.

4           Both parties rely on the opinion testimony of witnesses with experience in

5    the field of their inventions – molecular biology.

6           Broad presents Paul Simons, Ph.D., as a witness in its motions.  Dr. Simons

7    is a Reader in Experimental Genetics and Molecular Medicine with tenure at the

8    University College of London.  (*See* Declaration of Technical Expert Paul Simons

9    in Support of Broad et al. ("Simons Decl."), Exh. 2001, at ¶ 1.3.)  Dr. Simons

10   testifies that he has 35 years of research experience in the development of genetic

11   manipulation methods and has published many research papers in peer reviewed

12   journals.  (*Id.*; *see also* Curriculum Vitae, Exh. 2002.)  We find Dr. Simons to be

13   qualified to provide opinion testimony on the subject matter of this interference.

14          UC relies on the testimony of two witnesses, Carol Greider, Ph.D. (*see., e.g.,*

15   Second Declaration of Carol Greider, Ph.D. ("Greider Decl."), Exh. 1534) and

16   Dana Carroll, Ph.D. (*see., e.g.,* Second Declaration of Dana Carroll, Ph.D.

17   ("Carroll Decl."), Exh. 1535).  We note that much of the direct testimony of Drs.

18   Greider and Carroll is substantially identical.

19          Dr. Greider testifies that she is a Professor of Molecular Biology and

20   Genetics and Professor of Oncology, Daniel Nathans Professor and Director in the

21   Department of Molecular Biology & Genetics and Bloomberg Distinguished

22   Professor in the Department of Biology at The Johns Hopkins University School of

23   Medicine.  (Declaration of Carol Greider, Ph.D., Exh. 1022, at ¶ 15.)  She testifies

24   that since 1990 she has directed research focused on biochemistry and molecular

-4-

Interference 106,048

1 and cell biology, has published many peer-reviewed articles on her research, and

2 has been invited to author reviews and book chapters on those topics. (*Id.* at ¶¶ 16

3 and 24.) We find Dr. Greider to be qualified to provide opinion testimony on the

4 subject matter of this interference.

5      Dr. Carroll testifies that he is a Distinguished Professor of Biochemistry at

6 the University of Utah School of Medicine. (Declaration of Dana Carroll, Ph.D.,

7 Exh. 1024, at ¶ 15.) He testifies that he has authored many original peer-reviewed

8 publications on his research in the fields of biochemistry, molecular biology,

9 genetics, and genome editing, as well as invited reviews and book chapters on

10 those topics. (*Id.* at ¶ 18.) We find Dr. Carroll to be qualified to provide opinion

11 testimony on the subject matter of this interference.

12                                           C.

13      The Type II[3] CRISPR-Cas system comprises three components: (1) a crRNA

14 molecule, which is called a "guide sequence" in Broad's claims[4] and a "targeter-

15 RNA" in UC's claims, (2) a "tracr RNA," which is called an "activator-RNA" in

16 UC's claims, (3) and a protein called Cas9. (Simons Decl., Exh. 2001, at ¶ 2.9;

17 Greider Decl., Exh. 1022, at ¶ 50.) To alter a DNA molecule, the system must

18 achieve three interactions: (1) crRNA binding by specific base pairing to a specific

19 sequence in the DNA of interest ("target DNA"), (2) crRNA binding by specific

---

[3] Type I and Type III CRISPR-Cas systems were also known to be present in bacteria, but these other systems use different molecular mechanisms for nucleic acid cleavage. (Greider Decl., Exh. 1022, ¶ 49.)

[4] Some of Broad's claims recite a "guide RNA." Broad's patents explain: "The invention comprehends the guide RNAs comprising a guide sequence fused to a tracr sequence." Broad patent 8,697,359, Exh. 1007, at 2:53-54.

Interference 106,048

1  base pairing at another sequence to a tracr RNA, and (3) tracr RNA interacting

2  with a Cas9 protein, which then cuts the target DNA at the specific site.  These

3  interactions are depicted in Figure 5A of Jinek 2012[5] (Exh. 1155), which is

4  reproduced below.



5

6  Figure 5A depicts a double-stranded target DNA sequence that is bound to a

7  crRNA (as indicated by the vertical black lines showing nucleic acid base pairing).

8  A different part of the crRNA is bound to a tracrRNA.  The tracrRNA interacts

9  with a Cas9 protein that cuts the target DNA in a site-specific matter.  By linking a

10  DNA-cutting enzyme to a specific site on the target DNA, the CRISPR-Cas9

11  system achieves specific, targeted manipulation of DNA.

12      The CRISPR-Cas9 system occurs naturally in bacteria, which are in the

13  category of living organisms called "prokaryotes."  CRISPR-Cas9 is not known to

14  occur naturally in the category of living things that includes plants and animals –

---

[5] Jinek et al., 337 SCIENCE 816-21 (2012) (Exh. 1155).

Interference 106,048

1    the "eukaryotes." (*See* Declaration of Carol Greider, Ph.D., Exh. 1022, at ¶ 51;

2    Simons Decl., Exh. 2001, at ¶ 2.1.)

3                                    D.

4            Several motions authorized for this phase of the interference are before us.

5    Motions for priority of invention have not yet been authorized.

6            Broad filed a motion arguing that the interference should not have been

7    declared because there is no interference-in-fact between the parties' claims.  (*See*

8    Broad Motion 2, Paper 77.)  Broad also filed a motion to argue that even if some of

9    the parties' claims interfere, other Broad claims do not correspond to Count 1

10   because they are not anticipated or rendered obvious by it.  (Broad Motion 5,

11   Paper 67.)

12           Both parties claim the benefit of earlier filed applications and have filed

13   motions to be accorded these earlier filing dates as constructive reductions to

14   practice of Count 1.  (*See* Broad Motion 3, Paper 66, and UC Motion 4, Paper 57.)

15           UC filed a motion arguing that Count 1 should be replaced by Proposed

16   Count 2.  (UC Motion 3, Paper 56.)  Broad filed a motion responsive to UC

17   Motion 3, arguing that if Count 1 is replaced by Proposed Count 2, Broad should

18   be accorded the benefit of the filing date of its earlier filed applications as to the

19   new count.  (Broad Motion 6, Paper 570.)

20           The parties each also filed motions to exclude evidence of the other.  (*See*

21   Broad Miscellaneous Motion 8, Paper 878; UC Miscellaneous Motion 5,

22   Paper 880.)

Interference 106,048

1    Broad was authorized to file a motion arguing that UC does not have written

2    description support for its claims under 35 U.S.C. § 112.  Broad elected not to file

3    that motion.  (*See* Paper 565.)

4    We use our discretion to take up these motions in the order that secures the

5    just, speedy, and inexpensive determination of this proceeding.  *See* 37 C.F.R.

6    § 41.125(a) ("The Board may take up motions for decisions in any order, may

7    grant, deny, or dismiss any motion, and may take such other action appropriate to

8    secure the just, speedy, and inexpensive determination of the proceeding.").

9

10    *III.    Broad Motion 2 – No Interference-in-Fact*

11    We first consider Broad Motion 2, which argues that there is no interference-

12    in-fact, because it will determine if the interference should have been declared and

13    if it should continue.  An interference determines whether claims are patentable

14    under 35 U.S.C. § 102(g)[6], wherein "[a] person shall be entitled to a patent unless

15    . . . during the course of an interference . . . . another inventor involved therein

16    establishes . . .  that before such person's invention thereof the invention was made

17    by such other inventor. . . ."  Thus, if two parties claim patentably indistinct subject

18    matter, a patent can be awarded to only the first inventor under 35 U.S.C. § 102(g).

19    Whether an interference occurs is determined by comparing the parties'

20    involved claims.  *See Noelle v. Lederman*, 355 F.3d 1343, 1352 (Fed. Cir. 2004)

---

[6] Interferences continue under the statutes that were in effect on March 15, 2013.
*See* Pub. L. 112-29, § 3(n), 125 Stat. 284, 293 (2011).

-8-

Interference 106,048

1  ("if the Board is to compare two inventions [in a determination of interference-in-

2  fact], the Board must only compare the parties' claims.")  To make this

3  comparison, we use a "two-way test" wherein "the subject matter of a claim of one

4  party would, if prior art, have anticipated or rendered obvious the subject matter of

5  a claim of the opposing party and vice versa."  37 C.F.R. §41.203(a).  *See Eli Lilly*

6  *& Co. v. Bd. of Regents of Univ. of Wash.*, 334 F.3d 1264, 1270 (Fed. Cir. 2003)

7  (holding that the Board committed no error in interpreting its own rule to apply the

8  "two-way test" when determining if an interference-in-fact existed between junior

9  party's genus claims and senior party's claims to a species within that genus); *see*

10  *also Noelle*, 355 F.3d at 1350–51 ("In order to determine whether the two parties

11  claim the same patentable invention, the USPTO has promulgated a "two-way"

12  test, which has been approved by this court.").

13       In this proceeding, to prevail on its argument that there is no interference,

14  Broad must show that the parties' claims do *not* meet at least one of the following

15  two conditions:

16       1)  that, if considered to be prior art to UC's claims, Broad's involved

17            claims would not anticipate or render obvious UC's involved claims, or

18       2)  that, if considered to be prior art to Broad's claims, UC's involved

19            claims would not anticipate or render obvious Broad's claims.

20  Broad will prevail and a determination of no interference-in-fact will be made if a

21  preponderance of the evidence indicates one of these conditions is not met.  *See*

22  *Yorkey v. Diab*, 605 F.3d 1297, 1300 (Fed. Cir. 2010) (no interference-in-fact must

23  be shown by a preponderance of the evidence); *see* 37 C.F.R. § 41.208(b) ("To be

24  sufficient, a motion must provide a showing, supported with appropriate evidence,

Interference 106,048

1  such that, if unrebutted, it would justify the relief sought.  The burden of proof is
2  on the movant.").
3       Broad's argument is that the second of these conditions is not met, wherein
4  UC's claims would not anticipate or render obvious Broad's claims if UC's claims
5  were considered to be prior art.

6                                    A.

7       For the purposes of evaluating the arguments relating to Broad's Motion 1,
8  the following claims are representative.  Claim 165 of UC's involved '859
9  application recites:

10              A method of cleaving a nucleic acid comprising
11                  contacting a target DNA molecule having a target sequence
12          with an engineered and/or non-naturally-occurring Type II Clustered
13          Regularly Interspaced Short Palindromic Repeats (CRISPR)—
14          CRISPR associated (Cas) (CRISPR-Cas) system comprising
15                  a) a Cas9 protein; and
16                  b) a single molecule DNA-targeting RNA comprising
17                      i) a targeter-RNA that hybridizes with the target
18                        sequence, and
19                      ii) an activator-RNA that hybridizes with the targeter-
20                        RNA to form a double-stranded RNA duplex of a
21                        protein-binding segment,
22              wherein the activator-RNA and the targeter-RNA are covalently
23          linked to one another with intervening nucleotides,
24              wherein the single molecule DNA-targeting RNA forms a
25          complex with the Cas9 protein,
26              whereby the single molecule DNA-targeting RNA targets the
27          target sequence, and the Cas9 protein cleaves the target DNA
28          molecule.
29
30  (Senior Party Clean Copy of Claims, Paper 12, at 2.)  UC also has claims drawn to

Interference 106,048

1    CRISPR-Cas9 systems.  None of UC's claims are limited to any particular

2    environment.

3        Claim 1 of Broad's involved patent 8,697,359 recites:

4            A method of altering expression of at least one gene product
5            comprising introducing into a *eukaryotic cell* containing and
6            expressing a DNA molecule having a target sequence and encoding
7            the gene product an engineered, non-naturally occurring Clustered
8            Regularly Interspaced Short Palindromic Repeats (CRISPR)--CRISPR
9            associated (Cas) (CRISPR-Cas) system comprising one or more
10           vectors comprising:
11               a) a first regulatory element operable in a eukaryotic cell
12           operably linked to at least one nucleotide sequence encoding a
13           CRISPR-Cas system guide RNA that hybridizes with the target
14           sequence, and
15               b) a second regulatory element operable in a eukaryotic cell
16           operably linked to a nucleotide sequence encoding a Type-II Cas9
17           protein,
18               wherein components (a) and (b) are located on same or different
19           vectors of the system, whereby the guide RNA targets the target
20           sequence and the Cas9 protein cleaves the DNA molecule, whereby
21           expression of the at least one gene product is altered; and, wherein the
22           Cas9 protein and the guide RNA do not naturally occur together.

23

24   (Replacement Broad Clean Copies of Claims, Paper 17, at 3 (emphasis added).)

25   Like UC, Broad also has claims to CRISPR-Cas systems that are involved in this

26   interference.  Unlike UC's claims, all of Broad's claims are limited to the method

27   or system being used in eukaryotic cells.

28                                B.

29       "Anticipation requires a showing that each limitation of a claim is found in a

30   single reference, either expressly or inherently." *Atofina v. Great Lakes Chem.*

-11-

Interference 106,048

1    *Corp.,* 441 F.3d 991, 999 (Fed. Cir. 2006).  UC admits that if treated as prior art,

2    none of its involved claims anticipate Broad's involved claims.  (UC Opp. 2,

3    Paper 652, at App'x 2-2, admitting Broad Statement of Material Fact 7.)  We agree

4    because none of UC's claims recite a limitation to a eukaryotic environment and

5    each of Broad's claims contains this limitation.  Thus, to prevail on its argument of

6    no interference-in-fact, Broad need only provide persuasive argument supported by

7    a preponderance of the evidence that UC's claims would not render Broad's claims

8    obvious if UC's claims are considered to be prior art to Broad's claims.

9                                                    C.

10        To determine obviousness, "the scope and content of the prior art are to be

11    determined; differences between the prior art and the claims at issue are to be

12    ascertained; and the level of ordinary skill in the pertinent art resolved." *Graham*

13    *v. John Deere Co. of Kansas City*, 383 U.S. 1, 17 (1966).  In our analysis we

14    assume that UC's claimed CRISPR-Cas9 system in a generic environment is the

15    "prior art."  This subject matter is compared to Broad's narrower claimed

16    eukaryotic cell environment.  We ascertain the level of ordinary skill in the art by

17    examining the evidence cited by the parties, as discussed below.

18        "The consistent criterion for determination of obviousness is whether the

19    prior art would have suggested to one of ordinary skill in the art that this process

20    should be carried out and would have a reasonable likelihood of success, viewed in

21    the light of the prior art." *In re Dow Chemical Co*., 837 F.2d 469, 473 (Fed. Cir.

22    1988).  Although the definition of "reasonable expectation" is somewhat vague, the

23    case law makes clear that a *certainty* of success is not required.  *Medichem, S.A. v.*

24    *Rolabo, S.L.*, 437 F.3d 1157, 1165–66 (Fed. Cir. 2006), *citing In re O'Farrell,* 853

Interference 106,048

1  F.2d 894, 903–04 (Fed.Cir.1988) ("Obviousness does not require absolute

2  predictability of success . . . [A]ll that is required is a reasonable expectation of

3  success."). The question of whether there would have been a reasonable

4  expectation of success is a question of fact. *See Par Pharm., Inc. v. TWI Pharm.,*

5  *Inc.,* 773 F.3d 1186, 1196 (Fed.Cir.2014).

6                                             1.

7         Broad argues that UC's involved claims would not render Broad's involved

8  claims obvious, either alone or in view of the available prior art, because a skilled

9  artisan would not have had a reasonable expectation that the CRISPR-Cas9 system

10  would work successfully in a eukaryotic cell. (Broad Motion 2, Paper 77, at 2:13-

11  16.) Broad's argument is based in part on evidence of the contemporaneous

12  statements made by those in the art at the time CRISPR-Cas9 was shown to work

13  outside of a prokaryotic environment.

14         To make its argument, Broad acknowledges that the UC inventors published

15  results in Jinek 2012 using the prokaryotic CRISPR-Cas9 system *in vitro*, that is, in

16  a non-cellular experimental environment, before Broad filed its claims directed to

17  the eukaryotic cell environment. (Broad Motion 2, Paper 77, at 3:15-4:2, citing

18  Jinek 2012, Exh. 1155.) Jinek 2012 demonstrates that isolated components of the

19  CRISPR-Cas9 system worked to contact and cleave a DNA target in an *in vitro*

20  system. (Jinek 2012, Exh. 1155, at abstract.) It is undisputed that Jinek 2012 does

21  not report the results of experiments using the CRISPR-Cas9 system in a

22  eukaryotic cell. Broad's argument is that the statements by those in the field made

23  contemporaneously to Jinek 2012 show that after it was known CRISPR-Cas9 is

24  active in a non-eukaryotic, *in vitro* environment, ordinarily skilled artisans did not

-13-

Interference 106,048

1  have a reasonable expectation that it would also work in eukaryotic cells.  (Broad

2  Motion 2, Paper 77, at 4:3-11.)

3      We pay particular attention to the statements made contemporaneously to

4  Jinek 2012 because where such statements conflict with testimony prepared for

5  litigation, contemporaneous statements have been considered to be stronger

6  evidence of a particular situation.  *See United States v. U.S. Gypsum Co.*, 333 U.S.

7  364, 395–96 (1948) (determining that oral testimony in conflict with

8  contemporaneous documentary evidence deserves little weight in a litigation

9  regarding price fixing of patented products); *see also Cucuras v. Sec'y of Dep't of*

10  *Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993) (holding no error

11  by the trial court or special master when greater weight was accorded to

12  contemporaneous medical records than to later, conflicting oral testimony).

13  Accordingly, we give significant weight to the statements by those in the art at the

14  time of Jinek 2012 regarding expectation of success in using a CRISPR-Cas9

15  system in eukaryotic cells.

16      Broad cites to statements written by UC inventors Jinek and Doudna that

17  although their findings in Jinek 2012 suggested the "exciting possibility" that

18  CRISPR-Cas9 complexes might constitute a simple and versatile RNA-directed

19  system for site-specific genome editing, "it was not known whether such a

20  bacterial system would function in eukaryotic cells." (Exh. 1057[7], at 1-2; *see* Broad

21  Motion 2, Paper 77, at 4:3-8.)

---

[7] Jinek et al. 2 ELIFE e00471 (2013), DOI: 10.7554/eLife.00471 (Exh. 1057).

Interference 106,048

1      Broad also cites to statements reportedly made by UC inventor Doudna after

2   Jinek 2012 that the publication "was a big success, but there was a problem.  We

3   weren't sure if CRISPR/Cas9 would work in eukaryotes—plant and animal cells."

4   (Exh. 2207[8], at 3; *see* Broad Motion 2, paper 77, at 4:8-11.)  In another report,

5   Doudna was quoted as stating that she had experienced "many frustrations" getting

6   CRISPR to work in human cells and that she knew that if she succeeded, CRISPR

7   would be "a profound discovery."  (Exh. 2230[9], at 3; *see* Broad Motion 2,

8   Paper 77, at 8:1-4.)

9      Broad cites to other statements attributed to Dr. Doudna regarding the

10  difficulties of genetic modification techniques in eukaryotes.  (Broad Motion 2,

11  Paper 77, at 9:5-22.)  One author quoted Dr. Doudna as saying: "The ability to

12  modify specific elements of an organism's genes has been essential to advance our

13  understanding of biology, including human health. . . . However, the techniques for

14  making these modifications in animals and humans have been a huge bottleneck in

15  both research and the development of human therapeutics."  (Sanders[10], Exh. 2259,

16  at 2.)  According to Broad, the contemporaneous statements of the UC inventors

17  demonstrate that one of ordinary skill in the art lacked a reasonable expectation of

18  success.  (Broad Motion 2, Paper 77, at 4:14-17.)

---

[8] 9 Catalyst Magazine 1-32, College of Chemistry, University of California, Berkeley (2014) (available at http://catalyst.berkeley.edu/slideshow/the-crispr-revolution/) (Exh. 2207).

[9] Pandika, OZY (2014) (http://www.ozy.com/rising-stars/jennifer-doudna-crispr-code-killer/4690) (Exh. 2230).

[10] Sanders, Berkeley News (2013) (http://news.berkeley.edu/2013/01/07/ cheap-and-easy-technique-to-snip-dna-could-revolutionize-gene-therapy/) (Exh. 2259).

Interference 106,048

1    In opposition to Broad's arguments, UC attempts to characterize these
2    statements as demonstrating the UC inventors "fully expected that the system
3    could be successfully used in eukaryotic cells" and that the inventors were simply
4    indicating that the confirmatory experimental results had not yet been reported.
5    (UC Opp. 2, Paper 652, at 27:6-28:13, citing Greider Decl., Exh. 1534, ¶¶ 30, 35-
6    36, and 68-70, and Carroll Decl., Exh. 1535, ¶¶ 30, 35-36, and 68-70.)

7    UC also argues that Jinek 2012 itself provided an expectation of success
8    using the CRISPR-Cas9 system in eukaryotic cells because it predicted "the
9    potential to exploit the system for RNA-programmable genome editing."
10   (Jinek 2012, Exh. 1155, at abstract.)  UC cites to a similar statement in Jinek 2012
11   that the results reported therein "rais[e] the exciting possibility of developing a
12   simple and versatile RNA-directed system to generate dsDNA breaks for genome
13   targeting and editing."  (*Id.* at 816; *see* UC Opp. 2, Paper 652, at 8:9-22.)  The UC
14   inventors conclude Jinek 2012 by stating:

15           Zinc-finger nucleases and transcription-activator–like effector
16           nucleases have attracted considerable interest as artificial enzymes
17           engineered to manipulate genomes. . . . We propose an alternative
18           methodology based on RNA-programmed Cas9 that could offer
19           considerable potential for gene-targeting and genome-editing
20           applications.
21
22   (Jinek 2012, Exh. 1155, at 820 (citations omitted).)  UC argues that because zinc-
23   finger nucleases (ZFNs) and transcription-activator-like enzymes (TALENs) were
24   the state of the art for DNA cleavage and genome editing in eukaryotic cells at the
25   time, these statements in Jinek 2012 would have been understood to be an explicit

-16-

Interference 106,048

1   proposal to use Type II- CRISPR-Cas system for eukaryotic gene editing.  (UC

2   Opp. 2, Paper 652, at 8:16-9:3.)

3        We agree with Broad that the statements by and attributed to the UC

4   inventors do not demonstrate a reasonable expectation of success.  Although the

5   statements express an eagerness to learn the results of experiments in eukaryotic

6   cells and the importance of such results, none of them express an expectation that

7   such results would be successful.  The contemporaneous commentary by the UC

8   inventors cited by Broad do not indicate that at the time of Jinek 2012 the

9   ordinarily skilled artisan would have reasonably expected the CRISPR-Cas9

10  system to work in eukaryotic cells.

11       UC also argues that the selected quotations from inventors Doudna and Jinek

12  are irrelevant because determination of interference-in-fact is from the viewpoint

13  of a person of ordinary skill, not an inventor.  (UC Opp. 2, Paper 652, at 27:12-14.)

14  Although this may be true, UC's argument only tends to persuade us more because

15  if the inventors themselves were uncertain, it seems that ordinarily skilled artisans

16  would have been even more uncertain.

17       To further support its argument of the lack of an expectation of success,

18  Broad cites to statements made by Dr. Carroll, UC's witness in this interference, to

19  demonstrate that those of skill in the art had doubts about using CRISPR-Cas9 in

20  eukaryotic cells.  (Broad Motion 2, Paper 77, at 5:4-25.)  Dr. Carroll wrote:

21            What about activity of the system in eukaryotic cells? Both zinc
22       fingers and TALE modules come from natural transcription factors
23       that bind their targets in a chromatin context. This is not true of the
24       CRISPR components. There is no guarantee that Cas9 will work
25       effectively on a chromatin target or that the required DNA–RNA

-17-

Interference 106,048

1      hybrid can be stabilized in that context. This structure may be a
2      substrate for RNA hydrolysis by ribonuclease H and/or *FEN1*, both of
3      which function in the removal of RNA primers during DNA
4      replication.  Only attempts to apply the system in eukaryotes will
5      address these concerns.
6
7  (Carroll[11], Exh. 1152, at 1660.)  Dr. Carroll also raised technical questions about

8  whether CRISPR-Cas9 could be used successfully in eukaryotic cells in the same

9  commentary.  Dr. Carroll discussed ways to potentially enhance the activity of

10  CRISPR cleavage in eukaryotic cells, while cautioning about the risk of

11  undesirable side effects.  (*Id.*)  Dr. Carroll concluded:

12      Gene editing through base pairing has been attempted many
13      times and is still being pursued. The efficiency of modification by
14      introduction of simple oligonucleotides, chemically modified oligos,
15      or oligo mimics such as peptide nucleic acids remains discouragingly
16      low in most cases. Triplex-forming oligonucleotides have shown
17      activity, but with a limited range of targets and less efficiency than
18      ZFN or TALEN cleavage. Whether the CRISPR system will provide
19      the next-next generation of targetable cleavage reagents remains to be
20      seen, but it is clearly well worth a try. Stay tuned.
21

22  (*Id.* (citations omitted).)  Although Dr. Carroll indicated there was reason to try

23  using the CRISPR system in eukaryotic cells, we do not discern any expectation

24  that it would work before results of the actual studies were known.

25      UC argues that Dr. Carroll's statements were discussed by Broad out of

26  context.  (UC Opp. 2, Paper 652, at 14:6-15:6.)  According to UC, Dr. Carroll's

27  conclusion to "[s]tay tuned," indicates that he clearly recognized the obviousness

_____

[11] Carroll, 20 MOLECULAR THERAPY 1658-60 (2012) (Exh. 1152).

Interference 106,048

1    of using the CRISPR-Cas9 system in eukaryotic cells, suggested doing so, and

2    expected that it would be done.  (UC Opp. 2, Paper 652, at 15:2-6.)

3         UC also cites to Dr. Carroll's and Dr. Greider's direct testimony in support

4    of this interpretation.  (*See* Greider Decl., Exh. 1534, ¶¶ 34-36 and Carroll Decl.,

5    Exh. 1535, ¶¶ 34-36.)  When questioned about his contemporaneous commentary

6    on cross-examination, Dr. Carroll explained that he was "expressing thoughts

7    about what -- if the CRISPR-Cas system did not work in eukaryotic cells, what

8    might be the -- the reasons." (Carroll Depo., Exh. 2012, 28:11-13.)

9         After considering all of the evidence, we are persuaded that Dr. Carroll did

10    not express an expectation that the CRISPR-Cas9 system could be used

11    successfully in eukaryotic cells.  Although we agree that Dr. Carroll expressed a

12    suggestion and an expectation that the necessary experiments would be done, he

13    did not state any expectation of what the results would be.  Instead, Dr. Carroll

14    pointed to differences between CRISPR-Cas9 and systems that work in eukaryotic

15    cells (ZFNs and TALENs) and wrote: "There is no guarantee that Cas9 will work

16    effectively on a chromatin target or that the required DNA-RNA hybrid can be

17    stabilized in that context." (Carroll, Exh. 1152, at 1660.)  We fail to see how "no

18    guarantee" indicates an expectation of success.  Although there need not be

19    absolute predictability for a conclusion of obviousness (*see In re Longi*, 759 F.2d

20    887, 897 (Fed. Cir. 1985), at best, Dr. Carroll's statement highlights some specific

21    reasons why the CRISPR-Cas9 system might fail in eukaryotes.  Thus, the only

22    conclusion we draw from Dr. Carroll's statement is that at the time, he did not have

23    a reasonable expectation that the system would work.

Interference 106,048

1      To further oppose Broad's arguments, UC cites to other commentary that

2  accompanied Jinek 2012 when it was published.  (UC Opp. 2, Paper 652, at 9:3-

3  24.)  In one article the author stated:

4          Jinek *et al*. realized that a highly specific, customizable RNA-directed
5          DNA nuclease could be useful to edit whole genomes. Based on the
6          20-nucleotide guide section of the crRNA, the enzyme could
7          theoretically introduce breaks at unique sites in any eukaryotic
8          genome. As a proof of concept, the authors programmed Cas9 to
9          cleave a plasmid carrying the gene encoding green fluorescent protein
10         at predetermined loci using a single chimeric crRNA containing just
11         the critical segment of the tracrRNA. DNA breaks induce cellular
12         DNA repair pathways . . . and this can be harnessed to disrupt, insert,
13         or repair specific genes of cells. Introducing DNA breaks at desired
14         loci using just Cas9 and a chimeric crRNA would be a substantial
15         improvement over existing gene-targeting technologies, such as zinc
16         finger nucleases and transcription activator–like effector nucleases, as
17         these require protein engineering for every new target locus . . . .
18         Efficient gene repair strategies in cells from patients, and the
19         reintroduction of repaired cells, could become increasingly important
20         for treating many genetic disorders.

21

22  (Brouns[12], Exh. 1471, at 2 (citations omitted).)  UC argues that because this

23  commentary presents a prediction that the CRISPR-Cas9 system would be an

24  important tool for treating genetic disorders, it demonstrates a contemporaneously

25  expressed expectation of success.  UC's witnesses, Drs. Greider and Carroll

26  support this view, testifying that the statements in this commentary (Exh. 1471)

27  and in Jinek 2012 would have given one of ordinary skill in the art a reasonable

---

[12] Brouns, 337 SCIENCE 808-09 (2012) (Exh. 1471).

Interference 106,048

1   expectation that the Type-II CRISPR-Cas system would cleave DNA in eukaryotic

2   cells.  (Greider Decl., Exh. 1534, ¶¶ 30-32 and Carroll Decl., Exh. 1535, ¶¶ 30-32.)

3       While we agree that Jinek 2012 proposed using the system of UC's involved

4   claims in eukaryotic cells, we do not agree that, on their face, discussion of a

5   "potential," a "possibility," or what Cas9 could "theoretically" do indicates that the

6   system was expected to work in eukaryotic cells.  Similarly, while the commentary

7   accompanying Jinek 2012 discussed the potential for using the system in

8   eukaryotic cells, we are not persuaded that the plain meaning of the language in the

9   commentary would have provided those in the art with a reasonable expectation of

10  success.

11      In addition, UC cites to a portion of a publication by Dr. Fei Ran, an

12  inventor named on some of Broad patents, describing her thoughts while

13  undertaking experiments of the CRISPR-Cas9 system in eukaryotes.  (UC Opp. 2,

14  Paper 652, at 13:5-15.)  Dr. Ran recounted that "[w]e built upon these exciting

15  discoveries [the identification of the CRISPR-Cas9 tracrRNA and use of a single

16  RNA in an *in vitro* system from Dr. Charpentier's and Dr. Dounda's labs], *but at*

17  *the same time, nobody knew if this was going to work in mammalian cells*."

18  (Exh. 1561, at 73 (emphasis added).)  Dr. Ran's full statement does not

19  demonstrate a reasonable expectation of success.  We acknowledge that Dr. Ran's

20  reported statement was made as a reflection, not contemporaneously, but we also

21  note that it was not made for the purposes of this proceeding and thus, we have no

22  reason to doubt that it reflects her understanding at the time.

23      UC cites to other statements by those in the art regarding the results reported

24  in Jinek 2012.  In one commentary, the author observed that "[i]t was immediately

-21-

Interference 106,048

1   obvious that such a system might be repurposed for genome engineering, similar to

2   ZFNs and TALENs." (Golic[13], Exh. 1473, at 304; *see* UC Opp. 2, Paper 652, at

3   15:18-21.)  In another article, it was observed that UC inventor Doudna and her

4   colleagues were in the process of gathering more details on how the RNA-guided

5   cleavage reaction works and were testing whether the system would work in

6   eukaryotic organisms.  (Yarris[14], Exh. 1546, at 3; *see* UC Opp. 2, Paper 652, at

7   28:22-29:12.)  Doudna was quoted as saying that "Although we've not yet

8   demonstrated genome editing, given the mechanism we describe it is now a very

9   real possibility."  (Yarris, Exh. 1546, at 3.)  Doudna also reportedly said: "Our

10  results could provide genetic engineers with a new and promising alternative to

11  artificial enzymes for gene targeting and genome editing in bacteria and other cell

12  types."  (*Id.*, at 1.)

13        We agree with UC that these are "positive, forward-looking" statements

14  apparently published before the filing of Broad's earliest provisional application.

15  (UC Opp. 2, Paper 652, at 28:22-29:12.)  We do not agree, though, that as such

16  they indicate Dr. Doudna or more importantly, the person having ordinary skill in

17  the art, had a reasonable expectation of success that CRISPR-Cas9 would work in

18  eukaryotic cells.  Statements of a "possibility" that the system might work and that

19  it "could" provide a "promising" alternative are not statements that it would be

---

[13] Golic, 195 GENETICS 303-308 (2013) (Exh. 1473).

[14] Yarris, NEWS CENTER, (2012) (http://newscenter.lbl.gov/2012/06/28/
programmable-dna-scissors/) (Exh. 1546).

Interference 106,048

1   expected to do so.  UC does not cite to statements that the system was "expected"

2   to work or that it would "likely" work or other more definite language.

3       The contemporaneous statements cited by both parties persuade us that one

4   of ordinary skill in the art would not have reasonably expected success before

5   experiments in eukaryotic cells were done.

6                                           2.

7       According to UC, the alleged fact that many independent research groups

8   were "immediately" able to use the CRISPR-Cas9 system in eukaryotic cells after

9   publication of Jinek 2012 is evidence there was a reasonable expectation of success

10  in doing so. (UC Opp. 2, Paper 652, at 30:10-21; *see also* 10:5-11:16.)

11      Regardless of how many groups achieved success in eukaryotic cells, we are

12  not persuaded that such success indicates there was an *expectation* of success

13  before the results from these experiments were known.  The unpublished results of

14  research groups are not necessarily an indication of whether ordinarily skilled

15  artisans would have expected the results achieved.  Instead of viewing such work

16  as evidence of an expectation of success, we consider the number of groups who

17  attempted to use CRISPR-Cas9 in eukaryotic cells to be evidence of the motivation

18  to do so, an issue that is not in dispute.  We agree with Broad's argument that a

19  large reward might motivate persons to try an experiment even if the likelihood of

20  success is very low.  (*See* Broad Reply 2, Paper 866, at 6:6-7.)  *See Institut Pasteur*

21  *& Universite Pierre Et Marie Curie v. Focarino*, 738 F.3d 1337, 1346 (Fed. Cir.

22  2013) ("The desire for that payoff could motivate pursuit of the method, but

23  'knowledge of the goal does not render its achievement obvious,' . . . ." (citing

24  *Abbott Labs. v. Sandoz, Inc.,* 544 F.3d 1341, 1352 (Fed.Cir.2008).).

-23-

Interference 106,048

1      UC argues that the research groups that were reportedly successful after

2  publication of Jinek 2012 "could not have undertaken the use of UC's Type II

3  CRISPR-Cas9 system in eukaryotic cells unless there was sufficient motivation

4  and expectation of success." (UC Opp. 2, Paper 652, at 11:5-7; *see also* 11:15-16.)

5  UC's witnesses Greider and Carroll testify that "the Doudna laboratory would not

6  have pursued and succeeded had they had no reasonable expectation of success in

7  moving the CRISPR-Cas9 complex into eukaryotic cells." (Greider Decl., Exh.

8  1534, ¶ 69; Carroll Decl., Exh. 1535, at ¶ 69; *see* UC Opp. 2, Paper 866, at 11:11-

9  16.) UC also argues, citing to the cross-examination testimony of Broad's witness,

10  that "[o]ne never does an experiment without the belief that it might work under

11  certain circumstances." (UC Opp. 2, Paper 652, at 30:1-2 citing Simons Depo.,

12  Exh. 1555, at 178:10-12.)

13      We are not persuaded by these arguments or evidence that because research

14  groups, including Dr. Doudna's, undertook experiments to determine if CRISPR-

15  Cas9 could work in eukaryotic cells, an ordinarily skilled artisan would have

16  necessarily expected these experiments to be successful. We are not persuaded

17  that a scientist's "belief" in the success of his or her own experiments is

18  necessarily a reasonable expectation of success that indicates obviousness. Were

19  this true, the requirement for a reasonable expectation of success or predictability

20  in the context of subject matter that would have been obvious to try would be

21  rendered meaningless.

22      In *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 421 (2007), the Court

23  determined that

24         [w]hen there is a design need or market pressure to solve a problem

-24-

Interference 106,048

> 1     and there are a finite number of identified, predictable solutions, a
> 2     person of ordinary skill has good reason to pursue the known options
> 3     within his or her technical grasp. If this leads to the anticipated
> 4     success, it is likely the product not of innovation but of ordinary skill
> 5     and common sense. In that instance the fact that a combination was
> 6     obvious to try might show that it was obvious under § 103.

8   Thus, the "anticipated" success of a solution to a problem when there are "a finite

9   number of identified, predictable solutions" may show that claimed subject matter

10   would have been obvious.  *See KSR,* 550 U.S. at 421.  If we were to accept that

11   success is reasonably expected for every experiment, under the framework

12   provided in *KSR,* subject matter would always be obvious under 35 U.S.C. § 103

13   when there is a design need or market pressure to solve a problem, a finite number

14   of solutions, and those of ordinary skill had the technical capability.  Instead of

15   creating a presumption of obviousness when researchers attempt experiments to

16   advance a field, the Federal Circuit has recognized:

> 17     The methodology of science and the advance of technology are
> 18     founded on the investigator's educated application of what is known, to
> 19     intelligent exploration of what is not known. Each case must be
> 20     decided in its particular context, including the characteristics of the
> 21     science or technology, its state of advance, the nature of the known
> 22     choices, the specificity or generality of the prior art, and the
> 23     predictability of results in the area of interest.

24   *Abbott Labs. v. Sandoz, Inc.*, 544 F.3d 1341, 1352 (Fed. Cir. 2008).  Thus, we look

25   to the specific context of the art at the time.

26                                       3.

27     To determine if under the facts of this case there would have been an

28   expectation of success in using CRISPR-Cas9 in eukaryotic cells, we compare the

Interference 106,048

1    specific evidence before us to the facts of the precedential case law.  *See Pfizer,*

2    *Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1366 (Fed. Cir. 2007) ("Undue dependence on

3    mechanical application of a few maxims of law, such as 'obvious to try,' that have

4    no bearing on the facts certainly invites error as decisions on obviousness must be

5    narrowly tailored to the facts of each individual case.").  For example, in *In re*

6    *Droge*, 695 F.3d 1334, 1337-38 (Fed. Cir. 2012), a reasonable expectation of

7    success of a method mediating sequence specific recombination of DNA in

8    eukaryotic cells with a modified enzyme was found because the normal enzyme

9    had previously been used to mediate similar recombination.

10        In *In re Kubin*, 561 F.3d 1351, 1360 (Fed. Cir. 2009), a reasonable

11    expectation of success of nucleic acids encoding a specific protein was found

12    because the prior art taught the same protein and also a five-step protocol for

13    cloning nucleic acid molecules encoding the protein.

14        In *Velander v. Garner*, 348 F.3d 1359, 1379 (Fed. Cir. 2003), a reasonable

15    expectation of success for challenged claims directed to producing a particular

16    protein in the milk of an animal was found because all of the elements were known

17    in the prior art and it was known that several other proteins had been produced in a

18    similar way.

19        In *PAR Pharm., Inc. v. TWI Pharm., Inc.*, 773 F.3d 1186, 1198 (Fed. Cir.

20    2014), a reasonable expectation of success in the use of nanoparticle technology in

21    formulation chemistry was found because that technology had become fairly

22    reliable and had produced consistent results.

23        In *Medichem, S.A. v. Rolabo, S.L.*, 437 F.3d 1157, 1166–67 (Fed. Cir. 2006),

24    a reasonable expectation of success in optimizing a reaction was found because

-26-

Interference 106,048

1    there were not too many parameters to vary and the principle parameter,

2    concentration of tertiary amine, was known.  Furthermore, the prior art gave more

3    than merely general guidance, indicating that low concentrations were best.

4         In *Pfizer*, a reasonable expectation of success was found because there was

5    only one parameter to vary to obtain the specific salt of the drug claimed.  (*Pfizer*,

6    480 F.3d at 1366.)  In addition, one skilled in the art had several references

7    available to use for direction and was capable of narrowing the possible salts

8    previously approved to a small group from which to choose and verify by routine

9    trial-and-error procedures.  (*Id.* at 1367-68.)

10        In contrast, in *In re Rinehart,* 531 F.2d 1048, 1054 (CCPA 1976), a

11   reasonable expectation of success was not found because the problem encountered

12   by the claimed method of commercial scale production of polyesters was not the

13   same problem addressed in the prior art and there was evidence that a combination

14   of the prior art steps could not be commercially scaled up successfully.

15        In *Boehringer Ingelheim Vetmedica, Inc. v. Schering-Plough Corp.*, 320

16   F.3d 1339, 1354 (Fed. Cir. 2003), a reasonable expectation of success was not

17   found for the claimed method of growing and isolating a particular virus with

18   monkey cells because the prior art reported failure with other viruses isolated with

19   monkey kidney cells.

20        In *Noelle v. Lederman*, 355 F.3d 1343, 1352–53 (Fed. Cir. 2004), a

21   reasonable expectation of success was not found for a method of isolating human

22   CD40CR antibodies using mouse CD40CR antibodies because expert witnesses

23   testified to the unpredictability in the state of the art at the relevant time.

-27-

Interference 106,048

1    In *Amgen, Inc. v. Chugai Pharm. Co.,* 927 F.2d 1200, 1207-08 (Fed. Cir.

2    1991), a  reasonable expectation of success in claims to a specific protein was not

3    found because none of the prior art references suggested that screening a human

4    genomic library would be likely to succeed in pulling out the gene of interest and

5    no one else had successfully used the technique for that purpose.  Furthermore,

6    patentee provided a witness who testified that it would have been "difficult" to find

7    the gene in 1983, and that there would have been no more than a fifty percent

8    chance of success.  (*Id.* at 1208.)

9    In *Institut Pasteur*, 738 F.3d at 1346, a reasonable expectation of success for

10   claims to methods of site directed double-stranded break in chromosomal DNA

11   with a "Group I intron" nuclease was not found because the prior art did not teach

12   using the nuclease on chromosomal DNA within a yeast cell and because the

13   Board failed to given proper weight to prior art teaching toxic effects of the

14   nuclease in cells.

15    These cases instruct us that whether or not one of ordinary skill in the art

16   would have had a reasonable expectation of success for the purposes of

17   determining obviousness depends on the specific nature of what was known from

18   the prior art about closely related subject matter.  Specific instructions that are

19   relevant to the claimed subject matter or success in similar methods or products

20   have directed findings of a reasonable expectation of success.  The availability of

21   only generalized instructions and evidence of failures with similar subject matter

22   have indicated the opposite.  Thus, we look to whether or not there were

23   instructions in the prior art that would be specifically relevant to CRISPR-Cas9

24   and would instruct those of ordinary skill how to achieve activity with that system

-28-

Interference 106,048

1  in eukaryotic cells.  We also look to whether there are examples in the prior art of

2  the success or failure of similar systems.

3                                                  4.

4         Broad argues that Dr. Simons reviewed the relevant prior art and found no

5  basis for a person of ordinary skill to have had a reasonable expectation of

6  successfully using CRISPR-Cas9 in eukaryotic cells.  (Broad Motion 2, Paper 77,

7  at 19:14-16, citing Simons Decl., Exh. 2001, ¶¶ 2.10-2.12.)  Broad's witness,

8  Dr. Simons, testifies:

9                  Prior to December 12, 2012, it was not known whether or not it would
10                 be possible to ensure appropriate ratios of Cas9 to guide RNA with
11                 appropriate timing and co-localization for complex formation and
12                 activity in a eukaryotic cell while minimizing or avoiding toxicity is
13                 an aspect of translating the CRISPR-Cas9 system to eukaryotic cells.
14                 The outcome could not be predicted from experiments in a
15                 biochemical system with purified components as in Jinek 2012. Thus,
16                 the skilled person had no reasonable expectation of success in
17                 ensuring a functional CRISPR-Cas9 system in eukaryotes.
18
19  (Simons Decl., Exh. 2001, at ¶ 6.26.)  In addition, Broad points to specific

20  evidence of prior work in the field.  (Broad Motion 2, Paper 77, at 4:14-7:23 and

21  14:10-18:2.)

22        Broad cites to Dr. Simons's testimony to explain that ordinarily skilled

23  artisans knew of several differences between prokaryotic and eukaryotic systems

24  that would make use of CRISPR-Cas9 in a eukaryotic system unpredictable even

25  though it was known to work endogenously in prokaryotes.  (Broad Motion 2,

26  Paper 77, at 6:4-7:23, citing Simons Decl., Exh. 2001, at ¶¶ 6.28; *see also* Broad

27  Motion 2, Paper 77, at 15:14-16:2.)  Dr. Simons explains that differences in gene

Interference 106,048

1   expression, protein folding, cellular compartmentalization, chromatin structure,

2   cellular nucleases, intracellular temperature, intracellular ion concentrations,

3   intracellular pH, and the types of molecules in prokaryotic versus eukaryotic cells,

4   would contribute to this unpredictability.  (Simons Decl., Exh. 2001, at ¶¶ 6.28.)

5        Dr. Simons explains in more detail that eukaryotic DNA is divided into

6   chromosomes composed of chromatin – tightly packed structures of DNA bound to

7   proteins called histones.  (*See* Simons Decl., Exh. 2001, at ¶ 6.29.)  In contrast to

8   this tight packing, the DNA of prokaryotes exists as a single circle that is not

9   structured as chromatin. (*Id.*)  Dr. Simons also contrasts the tightly packed and

10  structured chromatin of eukaryotes with the even simpler, naked plasmid DNA

11  used in Jinek 2012.  (*Id.*)  According to Dr. Simons, a person of ordinary skill in

12  the art at the time could not have been predicted Cas9 would be able to access the

13  tightly packed eukaryotic genome from the prior art uses of CRISPR-Cas9 with

14  more relaxed DNA.  (*Id.*)

15       Broad argues further that it was known that differences in the cellular

16  conditions between prokaryotes and eukaryotes could affect protein folding and

17  could have prevented the CRISPR-Cas9 system from undergoing the

18  conformational changes that allow it to work.  (Broad Motion 2, Paper 77, at

19  15:14-16:2, citing Simons Decl., Exh. 2001, ¶¶ 6.13 and 6.33.)  In support,

20  Dr. Simons testifies that the prior art showed protein folding to be critical because

21  it is inextricably linked to function, noting that in eukaryotes misfolded proteins

22  may be degraded through a pathway not present in prokaryotes.  (Simons Decl.,

Interference 106,048

1   Exh. 2001, ¶ 6.33, citing Goldberg[15], Exh. 2242 (*e.g.* "In eukaryotic cells, the large

2   ATP-dependent proteolytic machine . . . prevents the accumulation of non-

3   functional, potentially toxic proteins." (abstract).)  Dr. Simons testifies that

4   conditions such as temperature, pH, and ion (*e.g.* magnesium) concentration could

5   affect protein folding.  (*Id.* at ¶ 6.13.)  According to Dr. Simons, because of these

6   differences in prokaryotic and eukaryotic environments, skilled artisans would not

7   have been able to predict with any reasonable certainty how the prokaryotic system

8   would act in a eukaryotic cell.  (*Id.*)

9        Broad argues further that the possible degradation of foreign RNA in

10  eukaryotic cells would have presented one of ordinary skill in the art with another

11  uncertainty about using the CRISPR-Cas9 system in eukaryotes.  (Broad Motion 2,

12  Paper 77, at 15:17-22, citing Simons Decl., Exh. 2001, at ¶ 6.15.)  Broad argues

13  that even more uncertainty existed because bacterial proteins and RNA can be

14  toxic to eukaryotic cells.  (Broad Motion 2, Paper 77, at 15:22-16:2, citing Simons

15  Decl., Exh. 2001, at ¶ 6.60.)  For example, Loonstra[16] (Exh. 2224), cited by

16  Dr. Simons, teaches that the prokaryotic protein Cre can be toxic at high levels,

17  requiring careful titration for gene modification in mammalian cells.  (Loonstra,

18  Exh. 2224, at abstract.)

19        In opposition to Broad's arguments, UC argues that one of ordinary skill in

20  the art would not have considered any of the issues identified by Broad to be

21  impediments for the Type-II CRISPR-Cas9 system in eukaryotic cells.  (UC

---

[15] Goldberg, 426 NATURE 895 (2003).

[16] Loonstra, 98 PROC. NAT'L ACAD. SCI 9209 (2001).

-31-

Interference 106,048

1   Opp. 2, Paper 652, at 21:10-23:23, citing Greider Decl., Exh. 1534, at ¶¶ 93-109,

2   and Carroll Decl., Exh. 1535, at ¶¶ 93-109.)  UC cites to the cross-examination

3   testimony of Broad's witness, Dr. Simons, who explained that none of the

4   differences noted by Broad actually presented any difficulty in using CRISPR-

5   Cas9 in eukaryotic cells.  (UC Opp. 2, Paper 652, at 21:6-20, citing Simons Depo.,

6   Exh. 1555, at 179:8-180:9, 192:10-193:16, 202:2-22, and 203:16-21.)

7        Dr. Simons's testimony about the lack of actual impediments in eukaryotes

8   is not persuasive because the relevant question before us is whether those of skill

9   in the art would have *expected* there to be problems *before* the experiments were

10  done.  We note that despite Dr. Simons's testimony about the eventual results of

11  using CRISPR-Cas9, he reiterated his opinion that "a person of ordinary skill in the

12  art would have been concerned about [issues such as toxicity]."  (Simons Depo.,

13  Exh. 1555, at 194:11-13.)  We are not persuaded that the ultimate success is

14  indicative of the expectation of success before the experiments were completed.

15       Similarly, we are not persuaded by UC's arguments that because the

16  ultimate success in using CRISPR-Cas9 in eukaryotic cells was achieved with only

17  conventional and routine materials and techniques, there would have been a

18  reasonable expectation of success.  (*See* UC Opp. 2, Paper 652, at 1:13-22, 11:17-

19  12:12, and 16:14-17:20.)  The ultimate results of an experiment do not indicate

20  what one of ordinary skill in the art would have thought before the experiment was

21  performed.  "That the inventors were ultimately successful is irrelevant to whether

22  one of ordinary skill in the art, at the time the invention was made, would have

23  reasonably expected success." *Life Techs., Inc. v. Clontech Labs., Inc.*, 224 F.3d

24  1320, 1326 (Fed. Cir. 2000).

Interference 106,048

1     UC also relies on its witnesses to argue that those of skill in the art would

2   not have expected the generalized issues Broad cites to be impediments to using

3   the CRISPR-Cas9 system in eukaryotic cells.  (UC Opp. 2, Paper 652, at 21:13-

4   23:23.)  For example, Drs. Greider and Carroll testify that protein folding would

5   not have been expected to be an impediment because other prokaryotic proteins

6   were known to fold properly and because those of skill in the art knew that

7   functional proteins could be injected directly into eukaryotic cells.  (UC Opp. 2,

8   Paper 652, at 21:13-22:4, citing Greider Decl., Exh. 1534, at ¶¶ 78-79, and Carroll

9   Decl., Exh. 1535, at ¶¶ 78-79.)  Drs. Greider and Carroll also cite to statements in

10   the prior art that deemphasize the overall impact of misfolding and protein

11   degradation on activity.  (*See* Greider Decl., Exh. 1534, at ¶ 78, and Carroll Decl.,

12   Exh. 1535, at ¶ 78, both citing Goldberg, Exh. 2242, at 896.)

13     UC argues further that chromatin structure would not have been a reason for

14   those of ordinary skill to have doubted the success of using CRISPR-Cas9 in

15   eukaryotic cells because other prokaryotic DNA-targeting proteins were known to

16   act on eukaryotic chromatin successfully.  (UC Opp. 2, Paper 652, at 22:5-22,

17   citing Greider Decl., Exh. 1534, at ¶¶ 55 and 95-97, and Carroll Decl., Exh. 1535,

18   at ¶¶ 55 and 95-97.)  We consider these arguments to be less persuasive because of

19   the statement Dr. Carroll made contemporaneously with the publication of

20   Jinek 2012.  (*See* Carroll, Exh. 1152, at 1660.)  Dr. Carroll wrote: "There is no

21   guarantee that Cas9 will work effectively on a chromatin target or that the required

22   DNA–RNA hybrid can be stabilized in that context."  (Carroll, Exh. 1152, at

23   1660.)  Because we give contemporaneous evidence more weight than evidence

24   prepared for litigation (*see U.S. Gypsum Co.*, 333 U.S. at 395–96), we are

-33-

Interference 106,048

1    persuaded that one of skill in the art would not have dismissed the possibility that

2    chromatin structure could prevent CRISPR-Cas9 from working successfully in a

3    eukaryotic cell.

4          Furthermore, we give UC's witnesses' testimony less weight because

5    Dr. Carroll agreed that prior successes with prokaryotic proteins would only

6    indicate that "the next prokaryotic protein that somebody was studying might or

7    might not work in a chromatin context . . . ." (Carroll Depo., Exh. 2012, at 27:12-

8    15.) Thus, on balance, the evidence supports Broad's argument that success with

9    select prokaryotic proteins and systems would not have provided those of ordinary

10   skill with a reasonable expectation that any of the thousands of prokaryotic system,

11   including the CRISPR-Cas9 system, would work in the context of eukaryotic

12   chromatin. (Broad Reply 2, Paper 866, at 11:15-12:6.)

13         UC argues that the other potential problems in achieving the activity of a

14   prokaryotic system in eukaryotic cells raised by Broad had routine, well-known

15   solutions at the time, such as codon optimization, targeting of prokaryotic proteins

16   to cellular compartments, such as the nucleus, and the manipulation of ions and

17   pH. (UC Opp. 2, Paper 652, at 22:23-23:23, citing Greider Decl., Exh. 1534, at

18   ¶¶ 98-102, and Carroll Decl., Exh. 1535, at ¶¶ 98-102.) UC argues further that

19   those of ordinary skill in the art would have known there were ways to avoid some

20   of the concerns raised by Broad, citing to studies of directly injecting other

21   prokaryotic systems to achieve genomic DNA modification in eukaryotic cells.

Interference 106,048

1  (UC Opp. 2, Paper 652, at 24:1-10, citing Greider Decl., Exh. 1534, at ¶ 104, and

2  Carroll Decl., Exh. 1535, at ¶ 104, and Mastroianni[17], Exh. 1293, at 12.)

3       We credit Drs. Greider's and Carroll's testimony regarding some of the

4  strategies that were known in the art, including direct injection, codon

5  optimization, and targeting of proteins and RNA to the cell nucleus. According to

6  their testimony, these techniques were routine and known to be useful in achieving

7  activity of prokaryotic proteins in eukaryotic cells. Thus, not all of Broad's

8  arguments regarding the generalized reasons why one of ordinary skill in the art

9  would have lacked an expectation of success using a prokaryotic system in a

10  eukaryotic cell persuade us. Nevertheless, because some techniques for using

11  prokaryotic systems in eukaryotic cells were known to those of ordinary skill, the

12  motivation to try using CRISPR-Cas9 in eukaryotic cells could have been even

13  greater. We discern nothing about the expectation of success merely because there

14  was great motivation to achieve a result. If anything, it is possible that great

15  motivation could encourage artisans to try even when there is little expectation of

16  success. (*See* Broad Reply 2, Paper 866, at 6:6-7.)

17       In addition to the general reasons for a lack of expectation of success, Broad

18  cites to evidence of failed attempts at transferring other prokaryotic, RNA-based

19  systems into eukaryotic environments. (Broad Motion 2, Paper 77, at 16:3-18:2.)

20  Specifically, Broad focuses on three systems that work in prokaryotic and *in vitro*

21  environments, but do not work well in a eukaryotic environment: riboswitches,

---

[17] Mastroianni et al., 2 PLoS ONE e3121. doi:10.1371/journal.pone.0003121 (2008) (Exh. 1293).

Interference 106,048

1  ribozymes, and group II introns.

2      The first example, riboswitches, are RNAs that naturally regulate gene

3  expression in bacteria in response to ligands.  (Broad Motion 2, Paper 77, at 16:9-

4  19, citing Simons Decl., Exh. 2001, ¶ 6.47.)  According to Dr. Simons, even

5  though there was great interest in controlling gene expression in eukaryotes with

6  riboswitches, only a few riboswitches have been successful.  (*Id.*)  Link[18]

7  (Exh. 2223), cited by Dr. Simons, states: "Given that a few TPP riboswitches are

8  the only validated metabolite-binding riboswitches in eukaryotes, it is not yet clear

9  whether splicing control is a preferential mechanism for the control of gene

10  expression by RNA switches."  (Link, Exh. 2223, at 1192.)  Link explains further:

11          Several early reports involving the grafting of aptamers[19] onto
12          ribozymes or messenger RNAs revealed some of the potential of
13          engineered RNAs to serve as ligand-modulated gene-control systems.
14          Unfortunately, a number of factors intervene to prevent many
15          engineered RNA switches from becoming useful genetic switches. For
16          example, the functions of most aptamers have not been validated in
17          cells, the folding of RNA constructs might differ between test tube
18          and cell, or the ribozyme chosen for RNA switch construction might
19          not be appropriate for controlling gene expression.
20
21  (*Id.* at 1190 (citations omitted).)  Link demonstrates that those of skill in the art

22  would have known that RNA folding differences between a test tube environment

23  and a cell environment may prevent genome engineering.

24      Ribozymes, Broad's second example, are RNA molecules that catalyze

---

[18] Link et al., 16 GENE THERAPY 1189-1201 (2009) (Exh. 2223).
[19] An aptamer can be defined as an oligonucleotide, such as a riboswitch, that binds
to a specific target molecule.

Interference 106,048

1    biochemical reactions.  (Simons Decl., Exh. 2001, ¶ 6.44.)  Broad argues that

2    experience with these systems contributes to the lack of a reasonable expectation

3    of success using CRISPR-Cas9 in eukaryotic cells because, like CRISPR-Cas9,

4    they depend on RNAs to work.  (Broad Motion 2, Paper 77, at 16:19-17:2.)

5    According to Dr. Simons Koseki[20] (Exh. 2221) teaches that the efficacy of

6    ribozymes *in vitro* is not predictive of its functional activity *in vivo* for a variety of

7    reasons.  For example, Koseki states:

8               One of the most critical factors determining ribozyme activity in vivo
9               seems to be the association between the ribozyme and its target. A
10              significant fraction of ribozymes must be degraded during transport
11              and also during approach to the target site. For this reason,
12              colocalization of a ribozyme and its target does not, by itself,
13              guarantee the efficacy of ribozymes in vivo.
14

15   (Koseki, Exh. 2221, at 1876.)  But Koseki also states:

16              While we still cannot predict the relative stabilities in vivo of
17              transcripts, we can design ribozymes that can be transported into the
18              cytoplasm by incorporating secondary structures such as those shown
19              in Fig. 1. Since we cannot accurately predict the stability of a
20              transcript, we usually test several constructs and, in the case of
21              various genes tested to date, we have always been able to obtain a
22              cassette that can inactivate the gene of interest with >95% efficiency
23              . . . as long as we follow the rule described above.
24

25              The tRNA^{Val} vector may be useful for expression of functional RNAs
26              other than ribozymes whose target molecules are localized in the
27              cytoplasm. Although colocalization in the cytoplasm cannot by itself
28              guarantee effectiveness . . ., we can clearly increase the probability of

---

[20] Koseki et al., 73 J. VIROL. 1868-77, at 1875-76 (1999) (Exh. 2221).

Interference 106,048

1      success. In our hands, tRNA$^{Val}$ ribozymes have consistently high
2      activities, at least in cultured cells.
3
4  (*Id.* (citations omitted).)  Thus, although some success was achieved with

5  ribozymes, that success required a specific strategy developed particularly for

6  ribozymes.

7      Broad's third example cites Group II introns, which are RNA-based, self-

8  splicing nucleic acids found in prokaryotes.  (Simons Decl., Exh. 2001, at ¶ 6.37.)

9  Broad cites to Dr. Simons's testimony to argue that using Group II introns in

10  eukaryotic cells is very inefficient, "to the point where it is unusable." (Broad

11  Motion 2, Paper 77, at 17:3-18, citing Simons Decl., Exh. 2001, at ¶ 6.38.)

12  Dr. Simons testifies that the requirement for higher magnesium ion concentration

13  in eukaryotes and the spatial separation of transcription and translation by the

14  nuclear membrane present challenges in eukaryotes.  (Simons Decl., Exh. 2001, at

15  ¶ 6.38.)  In support of his testimony, Dr. Simons cites to Mastroianni (Exh. 2261),

16  which explains that Group II introns can work in eukaryotes, but only by

17  microinjection along with additional magnesium ions.  (Mastroianni, Exh. 2261, at

18  9.)  According to Broad, this limited success was achieved only after 16 years of

19  effort.  (Broad Reply 2, Paper 866, at 7:4-12.)  As with the ribozyme system

20  discussed above, in the face of the challenges and unpredictability of the Group II

21  intron system a specific strategy was developed to increase the likelihood of

22  success of that system *in vivo*.

23      UC argues that the examples cited by Broad are not evidence of a lack of

24  reasonable expectation of success for CRISPR-Cas9 in eukaryotic cells because, as

25  Dr. Simons admitted on cross-examination, each of the prokaryotic systems were

-38-

Interference 106,048

1   actually shown to function in eukaryotic cells.  (*See* UC Opp. 2, Paper 652, at 25:6-

2   14, citing Simons Depo., Exh. 1556, at 219:21-222:18; and 225:5-13.)  But, the

3   systems that Broad highlights each require a unique set of conditions, tailored to

4   the particular system, to achieve any level of success in eukaryotic cells.  UC does

5   not point to, and we do not recognize, any commonality between these conditions

6   that could be applied to CRISPR-Cas9.  Instead, the evidence cited by Broad

7   shows that because each of the riboswitch, ribozyme, and Group II intron RNA-

8   based systems required specific tailoring of conditions, one skilled in the art would

9   have expected that the CRISPR-Cas9 system would have also required its own set

10  of unique conditions.  Thus, even though skilled artisans knew of certain

11  techniques, such as direct injection, codon optimization, and targeting to the cell

12  nucleus, the totality of the evidence cited by both parties does not indicate there

13  was a common set of instructions known to ordinarily skilled artisans that would

14  have given them a reasonable expectation of success with CRISPR-Cas9.  In light

15  of the facts of the case law discussed above, the evidence of prokaryotic systems

16  such as riboswitches, ribozymes, and Group II introns that Broad presents indicates

17  ordinarily skilled artisan would not have had a reasonable expectation of success

18  using CRISPR-Cas9 in eukaryotic cells.

19          In addition to the RNA-based systems to which Broad refers, Broad also

20  addresses the evidence of expectation of success UC presented when it suggested

21  this interference.  (Broad Motion 2, Paper 77, at 20:9-22:13, citing UC Suggestion

22  for Interference filed 13 April 2015, Exh. 1529, at 28; *see also* UC Opp. 2,

23  Paper 652, at 17:21-19:2.)  According to Broad, none of the protein systems to

Interference 106,048

1  which UC's evidence refers resembles the Type II CRISPR-Cas9 system and,

2  therefore, are not informative.  (Broad Motion 2, Paper 77, at 20:13-17.)

3      Broad argues that the ZFN and TALEN systems discussed by UC are not

4  indicative of the expectations of the CRISPR-Cas9 system because they are

5  derived from natural transcription factors that bind targets in a chromatin context.

6  (Broad Motion 2, Paper 77, at 20:18-21:6.)  Broad explains that the ZFN and

7  TALENs systems are derived from bacterial proteins that naturally infect plants

8  and, thus, are not purely prokaryotic but are naturally active in eukaryotic cells.

9  (Broad Motion 2, Paper 77, at 20:23-21:3, citing Simons Decl., Exh. 2001 at

10  ¶¶ 6.69-6.70, citing UC Suggestion of Interference, Exh. 1529, at 30:3-6.)  Because

11  the RNA-protein complex of the CRISPR-Cas9 system had never been expressed

12  in or shown to be active in a eukaryotic cell before, Broad argues that the ZFNs

13  and TALENs systems are very different from the CRISPR-Cas9 system.  (Broad

14  Motion 2, Paper 77, at 21:3-6.)

15      UC opposes Broad's characterization of the ZFN and TALEN systems,

16  arguing that they use a prokaryotic restriction endonuclease domain and, thus, are

17  relevant.  (UC Opp. 2, Paper 652, at 19:4-12.)  In support, UC cites to the

18  testimony of its witnesses Drs. Greider and Carroll, which are substantially the

19  same.  (*See* Carroll Decl., Exh. 1535, at ¶ 52, and Greider Decl., Exh. 1534, at

20  ¶ 52.)  Although this testimony supports UC's argument, it does not address

21  Broad's argument that the entire ZFNs and TALENs proteins are hybrids between

22  prokaryotic domains and eukaryotic domains, which was admitted by UC in its

23  Suggestion of Interference (*see* Exh.  1529, at 30:3-6).  Dr. Simons explains that

24  while the nuclease domain may be of prokaryotic origin, the DNA binding

-40-

Interference 106,048

1    domains of the ZFNs are derived from eukaryotes and the TALE proteins are

2    produced in plants (eukaryotes).  (Simons Decl., Exh. 2001, at ¶ 6.70.)  Given this

3    more detailed information, we give less weight to Drs. Carroll and Greider

4    testimony that the ZFN and TALEN systems would have provided a person of

5    ordinary skill in the art with reasons to expect that the "analogous" Type-II

6    CRISPR-Cas9 system could be used in eukaryotic cells successfully.  (*See* Carroll

7    Decl., Exh. 1535, at ¶ 52, and Greider Decl., Exh. 1534, at ¶ 52.)

8        Furthermore, Dr. Carroll's testimony in this proceeding appears to contradict

9    the commentary he wrote contemporaneously with publication of Jinek 2012.  In

10   that commentary, Dr. Carroll discussed whether CRISPR-Cas9 would work in

11   eukaryotic cells and stated: "Both [ZFNs] and TALE modules come from natural

12   transcription factors that bind their targets in a chromatin context. This is not true

13   of the CRISPR components." (Carroll, Exh. 1152, at 1660.)  Thus, at the relevant

14   time, Dr. Carroll did not consider the ZFN or TALEN systems to be analogous or

15   relevant to the question of whether CRISPR-Cas9 would work in eukaryotic cells.

16   As explained above, we give this contemporaneous evidence significant weight.

17   Accordingly, we are not persuaded that the successful use of ZFN and TALEN

18   systems would have given those of skill in the art a reasonable expectation that

19   CRISPR-Cas9 could also have been used successfully in eukaryotic cells.

20       Broad argues that the other prokaryotic systems cited by UC would not have

21   been predictive of success because they are smaller and less complicated than the

22   CRISPR-Cas9 system.  (Broad Motion 2, Paper 77, at 21:7-18, citing Simons

23   Decl., Exh. 2001, at ¶¶6.67-6.68; Broad Reply 2, Paper 866, at 13:9-13.)

24   Specifically, Broad argues that other prokaryotic systems do not involve a complex

Interference 106,048

1  of both protein and RNA components.  As informed by Dr. Simons, Broad argues

2  that it was not known whether the prokaryotic RNA would be toxic to eukaryotic

3  cells.  (*Id*.)

4      Broad also argues that before use of these other prokaryotic systems was

5  confirmed, researchers expressed doubt that they would work.  (Broad Motion 2,

6  Paper 77, at 21:19-22:3.)  For example, researchers working with the Cre protein

7  stated:

8          [T]he ability of the Cre protein to access a *lox* site placed on a
9          chromosome and then to perform site-specific synapsis of DNA and
10         reciprocal recombination may be highly dependent on surrounding
11         chromatin structure and on the particular location within the genome
12         of the *lox* site. Some regions of the genome may be inaccessible to a
13         bacterial recombinase, for example.
14
15  (Sauer 1988[21], Exh. 1336, at 5170; Simons Decl., Exh. 2001, ¶ 6.59.)

16     UC counters that in the same publication about Cre, the researchers

17  demonstrated site-specific recombination by a prokaryotic protein in mammalian

18  cells.  (UC Opp. 2, Paper 652, at 19:13-23, citing Sauer 1998, Exh. 1336, at

19  abstract.)  UC argues further that an earlier publication demonstrated the ability of

20  the Cre recombinase to perform precise recombination events on eukaryotic

21  chromosomes unimpaired by chromatin structure.  (UC Opp. 2, Paper 652, at

22  19:13-23 and 22:5-22, citing Sauer 1987[22], Exh. 1335, at abstract; *see also* Carroll

23  Decl., Exh. 1535, at ¶¶ 54-55, and Greider Decl., Exh. 1534, at ¶¶ 54-55.)  Thus,

24  according to UC, doubts about access to chromatin were laid to rest.

---

[21] Sauer and Henderson, 85 PROC. NAT'L ACAD. SCI. 5166 (1988) (Exh. 1336).
[22] Sauer, 7 Mol. Cell. Biol. 2087 (1987) (Exh. 1335).

Interference 106,048

1    Although we agree that the Cre protein is an example of the successful use

2  of a prokaryotic recombinase protein in a eukaryotic cell, UC's opposition does not

3  address Dr. Simons's testimony that the Cre protein is smaller and less complicated

4  than the CRISPR-Cas9 system and so would not have informed those in the art

5  about an expectation of success with CRISPR-Cas9.  (*See* Simons Decl.,

6  Exh. 2001, at ¶¶ 6.67-6.68.)  Accordingly, reports of the success of the Cre protein

7  do not persuade us that those in the art would have expected CRISPR-Cas9 to

8  work.

9    UC cites to one example of a publication that Drs. Greider and Carroll

10  testify shows is "a multicomponent prokaryotic system including a protein

11  component and a nucleic acid component" functioning in eukaryotic cells.  (*See*

12  UC Opp. 2, Paper 652, at 25:22-26:7, citing Chen[23], Exh. 1597, and Carroll Decl.,

13  Exh. 1535, at ¶ 80, and Greider Decl., Exh. 1534, at ¶ 80.)  Beyond the general

14  statements of Drs. Greider and Carroll that a person of ordinary skill in the art

15  would not have considered the more complicated nature of the CRISPR-Cas9 to be

16  an unpredicatable impediment because of this publication, UC does not direct us to

17  any other explanation of this system (which is apparently a system for encoding

18  unnatural amino acids in mammalian cells) in comparison to the CRISPR-Cas9

19  system.  For example, it is unclear if this system functions in the nucleus of the

20  eukaryotic cells or if it achieves modification of a nucleic acid.  Without further

21  explanation, we are not persuaded that this one publication would indicate to an

_____

[23] Chen, et al., 48 ANGEW CHEM INT ED ENGL. 4052 (2009) (Exh. 1597).

-43-

Interference 106,048

1   ordinarily skilled artisan that the complexity of the CRISPR-Cas9 system would

2   not have impacted the expectation that it would work in eukaryotic cells.

3          UC argues further that Broad failed to consider other prior art references

4   allegedly suggesting that CRISPR systems in general could be used in eukaryotic

5   cells.  UC cites to U.S. patent application publication 2010/0076057 (Exh. 1161,

6   "Sontheimer") to argue that those of skill in the art would have been motivated to

7   use these systems in eukaryotic cells and would have been aware of the

8   conventional techniques, such as expression vectors, nuclear localization signals,

9   and codon optimization, that were available to do so.  (UC Opp. 2, Paper 652, at

10  7:8-20.)

11         We are not persuaded by this argument because, while Sontheimer

12  demonstrates a motivation for those of skill in the art to use a CRISPR system in

13  eukaryotic cells, an issue the parties do not dispute, UC does not direct us to

14  testimony or other evidence that an ordinarily skilled artisan would have had a

15  reasonable expectation of success in doing so.  Drs. Greider and Carroll testify that

16  Sontheimer "suggests" that the Type I and III CRISPR systems could be used

17  successfully in eukaryotic cells (Greider Decl. Exh. 1534, at ¶ 22; Greider Decl.

18  Exh. 1535, at ¶ 22), but counsel for UC stated at oral argument that Sontheimer

19  presents only "a research plan" (Transcript, Paper 892, at 16:11-12).  Despite the

20  argument in UC's brief, we are not persuaded that the suggestion in Sontheimer

21  indicates ordinarily skill artisans would have had any expectation of success for the

22  Type II CRISPR-Cas9 system.

23         Similarly, UC argues that other prokaryotic proteins, the RecA, EcoRI, and

24  Φ31 proteins, had been shown to co-localize with their targets in eukaryotic cells.

-44-

Interference 106,048

1   (UC Opp. 2, Paper 652, at 26:7-8, citing Greider Decl., Exh. 1534, at ¶ 82, and

2   Carroll Decl., Exh. 1535, at ¶ 82.)  UC also argues that none of these proteins were

3   actually hindered by chromatin, citing the testimony of Drs. Greider and Carroll to

4   show that eukaryotic DNA is a dynamic structure, constantly being rearranged and

5   exposed, rather than being fixedly bound in chromatin.  According to UC, Broad's

6   argument regarding the expected effects of chromatin structure are incorrect.  (UC

7   Opp. 2, Paper 652, at 22:5-22, citing Greider Decl., Exh. 1534, at ¶¶ 95-97, and

8   Carroll Decl., Exh. 1535, at ¶¶ 95-97; also citing Simons Depo., Exh. 1556, at

9   229:16-230:15 and 232:7-233:6.)

10      Despite the evidence about the effects of chromatin structure that UC

11  presents for this proceeding, we are still persuaded by Dr. Carroll's statement made

12  contemporaneously to Jinek 2012.  (*See* Carroll, Exh. 1152, at 1660: "There is no

13  guarantee that Cas9 will work effectively on a chromatin target or that the required

14  DNA–RNA hybrid can be stabilized in that context. . . . Only attempts to apply the

15  system in eukaryotes will address these concerns.")  Because the statements Dr.

16  Greider makes in her declaration are substantially identical to Dr. Carroll's in his

17  declaration, we do not give Dr. Greider's statements more weight than Dr.

18  Carroll's.

19      The preponderance of the evidence cited by Broad persuades us that there

20  would not have been specific instructions relevant to CRISPR-Cas9 to give one of

21  ordinary skill in the art a reasonable expectation of success it would work in

22  eukaryotic cells successfully.  Instead, we are persuaded that the failures

23  demonstrated with other systems would have indicated the lack of a reasonable

-45-

Interference 106,048

1  expectation of success.   UC's arguments and evidence do not persuade us

2  otherwise.

3                                    5.

4         In addition to its arguments about Broad's evidence, UC argues that other

5  references must be considered to determine the obviousness of Broad's involved

6  claims over UC's involved claims.  Specifically, UC points to documents dated at

7  least by 12 December 2012, the filing date of Broad's earliest provisional

8  application.  (UC Opp. 2, Paper 652, at 4:20-5:3.)  According to UC, these later

9  references are prior art because Broad did not show its involved claims are

10  deserving of an effective filing date as early as 12 December 2012.

11        For example, UC argues that US Patent Application 61/717,324 (Exh. 1545,

12  "the Kim provisional"), which was filed 23 October 2012, reports recognition and

13  cleavage of target DNA when Cas9 protein and a guide RNA were introduced into

14  human cells.  (UC Opp. 2, Paper 652, at 5:6-6:18, citing Kim provisional,

15  Exh. 1545, at 9[24].)  The Kim provisional indicates there was a "possibility" that the

16  CRISPR-Cas9 system taught in Jinek 2012 could be used for genome editing in

17  cells and organisms.  (Kim provisional, Exh. 1545, at 7.)  UC argues that this

18  provisional application and the non-provisional application based on it, which was

19  filed after the filing date of both UC's and Broad's involved applications and

20  patents, demonstrate that ordinarily skilled artisans had a reasonable expectation of

21  successfully using the CRISPR-Cas9 system in eukaryotic cells.  (UC Opp. 2,

---

[24] Page numbering for Exhibit 1545 reflects the page of the exhibit, not the
underlying document.

Interference 106,048

1  Paper 652, at 5:24-6:18.)  UC argues further that correspondence between the Kim

2  inventors and UC inventor Doudna expressing interest in the results reported in

3  Jinek 2012 is further evidence of this expectation of success.  (UC Opp. 2,

4  Paper 652, at 6:2-10, citing Exhs. 1557, 1558, and 1598.)

5       UC also argues that its own involved '859 application (Exh. 1001) and the

6  provisional application on which it is based, application 61/652,086 (Exh. 1003),

7  filed 25 May 2012, are prior art for the question of obviousness in the no

8  interference-in-fact inquiry.  (UC Motion 2, Paper 652, at 6:19-7:9.)  According to

9  UC, because these applications teach expression of a Type-II CRISPR-Cas system

10  in eukaryotic cells they anticipate or render obvious Broad's claims.  (UC Opp. 2,

11  Paper 652, at 7:1-7, citing, *e.g.* Exh. 1001 at ¶¶ 25, 103-105, 119-120, 244-251,

12  and 277-282; Exh. 1003 at ¶¶ 124-129, 165-177, 186-188, and 216.)

13       We agree with Broad that the Kim provisional, the non-provisional

14  application based on it, private discussions based on the information in it, and

15  UC's applications are not informative for the no interference-in-fact determination

16  before us.  (*See* Broad Reply 2, Paper 866, at 2:4-7.)  The parties' claims are the

17  prior art to be considered in an interference-in-fact inquiry.  *See* 37 C.F.R.

18  § 41.203(a) ("An interference exists if the subject matter of a claim of one party

19  would, if prior art, have anticipated or rendered obvious the subject matter of a

20  claim of the opposing party and vice versa.").  Interference-in-fact is a

21  determination of whether there is an interference, not whether the parties' claims

22  are patentable.  We do not consider the results presented in the Kim provisional

23  application or any other provisional application to be relevant to the interference-

24  in-fact question before us because this evidence was not available to the public.

-47-

Interference 106,048

1  Although prior art other than the parties' claims may be considered, it would only

2  be used to show what those of ordinary skill in the art knew at the time.  The

3  information in unpublished provisional applications was not available to those of

4  ordinary skill in the art and, therefore, is not relevant to the question of whether

5  one party's claims would have been rendered obvious by the other's.

6                                                      D.

7          Both parties filed motions to exclude specific evidence submitted by the

8  other.

9          Broad argues that UC exhibits 1475, 1548, 1550-1553, 1557-1560, 1598,

10  1604-10, 1612-18, 1620-28, 1636, and 1637 should be excluded.  (Broad Motion 8,

11  Paper 878, at 1:2-4.)  Even if we do not exclude this evidence, we do not consider

12  UC's arguments that rely on these exhibits to be persuasive.  Accordingly, Broad's

13  request to exclude this evidence is moot.

14          UC argues that Broad exhibits 2013 (at 169:12-174:24), 2127, 2213, 2268,

15  2281, 2289, 2291, 2298, 2312, 2404-2407, 2409-2412, 2415, 2416, 2419-2423,

16  and 2426-2428 should be excluded.  (UC Motion 5, Paper 880, at 1:2-6.)  Because

17  we were able to come to our determination without relying on these exhibits, we

18  dismiss UC's request to exclude them.

19          In summary, neither party has persuaded us that our decision on Broad's

20  Motion 2 should be different because of the exclusion of evidence.

21                                                      E.

22          The preponderance of the evidence, including the contemporaneous

23  statements of the inventors and others in the field, as well as the knowledge of

24  ordinarily skilled artisans, demonstrates that one of ordinary skill would not have

Interference 106,048

1  had a reasonable expectation of success that CRISPR-Cas9 could be used in a

2  eukaryotic cell.  In light of this finding, we determine that if they were prior art,

3  UC's claims would not have rendered Broad's claims obvious.  Because UC's

4  claims would not anticipate Broad's claims either, we conclude that the parties'

5  claims are not drawn to the same patentable subject matter and that there is no

6  interference-in-fact between them.  We note that "[i]t is well-settled that a narrow

7  species can be non-obvious and patent eligible despite a patent on its genus."

8  *Abbvie Inc. v. Mathilda & Terence Kennedy Inst. of Rheumatology Trust*, 764 F.3d

9  1366, 1379 (Fed. Cir. 2014).  An "earlier disclosure of a genus does not necessarily

10  prevent patenting a species member of the genus." *Eli Lilly & Co. v. Bd. of Regents*

11  *of Univ. of Wash.,* 334 F.3d 1264, 1270 (Fed.Cir. 2003).

12      Accordingly, we grant Broad's Motion 2 for a determination of no

13  interference-in-fact.

14

15      *IV.    Conclusion*

16      Based on our determination that the preponderance of the evidence shows

17  there is no interference-in-fact between the parties' claims, we need not decide the

18  other pending motions.  *Cf. Berman v. Housey*, 291 F.3d 1345, 1352 (Fed. Cir.

19  2002) (holding that the Board did not err in refusing to consider Berman's

20  patentability motion when Housey's motion under 35 U.S.C. § 135(b), "a condition

21  precedent to the declaration of an interference," was granted).  A determination of

22  no interference-in-fact deprives UC of standing to raise other challenges against

23  Broad's claims in this proceeding.  *See* 37 C.F.R. § 41.201 (defining no

24  interference-in-fact as an issue that deprives the opponent of the movant of

-49-

Interference 106,048

1    standing).  Accordingly, we terminate the proceeding without entering judgment

2    against either party's claims.

3

4    cc (via e-mail):

5    Attorneys for Junior Party Broad Institute:

6
7         Steven R. Trybus
8         Harry J. Roper
9         JENNER & BLOCK LLP
10        strybus@jenner.com
11        hroper@jenner.com
12
13
14    Attorneys for Senior Party University of California, et al.:
15
16        Todd R. Walters
17        Erin M. Dunston
18        Travis W. Bliss
19        BUCHANAN, INGERSOLL & ROONEY PC
20        todd.walters@bipc.com
21        erin.dunston@bipc.com
22        travis.bliss@bipc.com
23
24        Li-Hsien Rin-Laures
25        Sandip H. Patel
26        Greta Noland
27        MARSHALL GERSTEIN & BORUN LLP
28        lrinlaures@marshallip.com
29        spatel@marshallip.com
30        gnoland@marshallip.com

Interference 106,048

# APPENDIX

Involved Applications and Patents

## UC

| Application Number | Filing Date |
|---|---|
| 13/842,859 | 15 March 2013 |

## Broad

| Patent Number | Application Number | Filing Date |
|---|---|---|
| 8,697,359 | 14/054,414 | 15 October 2013 |
| 8,771,945 | 14/183,429 | 18 February 2014 |
| 8,795,965 | 14/183,486 | 18 February 2014 |
| 8,865,406 | 14/222,930 | 24 March 2014 |
| 8,871,445 | 14/259,420 | 23 April 2014 |
| 8,889,356 | 14/183,471 | 18 February 2014 |
| 8,895,308 | 14/293,498 | 2 June 2014 |
| 8,906,616 | 14/290,575 | 29 May 2014 |
| 8,932,814 | 14/258,458 | 22 April 2014 |
| 8,945,839 | 14/256,912 | 18 April 2014 |
| 8,993,233 | 14/105,017 | 12 December 2013 |
| 8,999,641 | 14/226,274 | 26 March 2014 |
|  | 14/704,551 | 5 May 2015 |

# EXHIBIT B

BoxInterferences@uspto.gov                                    Filed: February 15, 2017
Tel: 571-272-7822

UNITED STATES PATENT AND TRADEMARK OFFICE
———————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD
———————————

**THE BROAD INSTITUTE, INC.**, MASSACHUSETTS INSTITUTE
OF TECHNOLOGY, and PRESIDENT AND FELLOWS
OF HARVARD COLLEGE,
(Patents 8,697,359; 8,771,945; 8,795,965; 8,865,406; 8,871,445; 8,889,356;
8,895,308; 8,906,616; 8,932,814; 8,945,839; 8,993,233; 8,999,641
and Application 14/704,551),

**Junior Party**,

v.

**THE REGENTS OF THE UNIVERSITY OF CALIFORNIA,** UNIVERSITY
OF VIENNA, and EMMANUELLE CHARPENTIER
(Application 13/842,859),

**Senior Party.**

Patent Interference No. 106,048 (DK)

———————————

**JUDGMENT**
**37 C.F.R. § 41.127(a)**

Before RICHARD E. SCHAFER, SALLY GARDNER LANE, and
DEBORAH KATZ, *Administrative Patent Judges*.

*Per curiam.*

Interference 106,048

1    In light of the determination that the parties' claims do not interfere (*see*

2    Decision on Motions, Paper 893), we enter judgment of no interference-in-fact,

3    which neither cancels nor finally refuses either parties' claims.

4

5    cc (via e-mail):

6

7    Attorneys for Junior Party Broad Institute:

8

9    Steven R. Trybus

10    Harry J. Roper

11    JENNER & BLOCK LLP

12    strybus@jenner.com

13    hroper@jenner.com

14

15

16    Attorneys for Senior Party University of California, et al.:

17

18    Todd R. Walters

19    Erin M. Dunston

20    Travis W. Bliss

21    BUCHANAN, INGERSOLL & ROONEY PC

22    todd.walters@bipc.com

23    erin.dunston@bipc.com

24    travis.bliss@bipc.com

25

26    Li-Hsien Rin-Laures

27    Sandip H. Patel

28    Greta Noland

29    MARSHALL GERSTEIN & BORUN LLP

30    lrinlaures@marshallip.com

31    spatel@marshallip.com

32    gnoland@marshallip.com

2

EXHIBIT C

BoxInterferences@uspto.gov                          Filed: January 3, 2017
Tel: 571-272-7822


UNITED STATES PATENT AND TRADEMARK OFFICE
_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD
_____

**THE BROAD INSTITUTE, INC.**, MASSACHUSETTS INSTITUTE
OF TECHNOLOGY, and PRESIDENT AND FELLOWS
OF HARVARD COLLEGE,
(Patents 8,697,359; 8,771,945; 8,795,965; 8,865,406; 8,871,445; 8,889,356;
8,895,308; 8,906,616; 8,932,814; 8,945,839; 8,993,233; 8,999,641
and Application 14/704,551),

**Junior Party**,

v.

**THE REGENTS OF THE UNIVERSITY OF CALIFORNIA,** UNIVERSITY
OF VIENNA, and EMMANUELLE CHARPENTIER
(Application 13/842,859),

**Senior Party.**

Patent Interference No. 106,048 (DK)

_____

**ORDER – Late Submission of Evidence**
**37 C.F.R. § 41.104(a)**

Before RICHARD E. SCHAFER, SALLY GARDNER LANE, and
DEBORAH KATZ, *Administrative Patent Judges*.

*Per curiam.*

Interference 106,048

1    On 22 December 2016, Senior Party ("UC") contacted the Board seeking a

2  conference call to request authorization to file new evidence at this point in the

3  proceeding, wherein briefing is complete and oral arguments have been heard.

4  (*See* Attachment.)  UC represents that the documents that are the subject of its

5  request could not have been presented prior to the close of briefing.

6    UC requests that it be authorized to file copies of two Office Actions issued

7  in two different patent applications, neither of which is involved in this

8  interference.[1]  According to UC, the examiners of those applications addressed

9  information presented by Junior Party ("Broad") in the instant interference.

10  Reportedly, one examiner addressed exhibits filed by Broad in Broad Opposition 4

11  and the other examiner addressed arguments Broad made in this interference.

12    Broad opposes UC's request.  (*See* Attachment.)

13    UC has not indicated a purpose for adding the Office Actions to the record

14  of this proceeding.  It is not apparent what we would do with the new evidence.

15  Thus, it is not clear why we should consider authorization for UC to file them.  UC

16  was given a full and fair opportunity to argue and present evidence for the relief it

17  requests and in opposition to Broad's motions during the regular schedule of this

18  interference.  UC does not indicate otherwise or indicate that filing these

19  documents would cure any perceived deficiency.

20    It is Ordered that UC's request for a conference call seeking to file the

21  evidence cited is DENIED.

---

[1] Both applications have different inventive entities from the applications involved
in this interference.

2

Interference 106,048

1  Attachment: E-mail of 22 December 2016

2

3  cc (via e-mail):

4  Attorneys for Junior Party Broad Institute:

5

6        Steven R. Trybus

7        Harry J. Roper

8        JENNER & BLOCK LLP

9        strybus@jenner.com

10       hroper@jenner.com

11

12

13  Attorneys for Senior Party University of California, et al.:

14

15       Todd R. Walters

16       Erin M. Dunston

17       Travis W. Bliss

18       BUCHANAN, INGERSOLL & ROONEY PC

19       todd.walters@bipc.com

20       erin.dunston@bipc.com

21       travis.bliss@bipc.com

22

23       Li-Hsien Rin-Laures

24       Sandip H. Patel

25       Greta Noland

26       MARSHALL GERSTEIN & BORUN LLP

27       lrinlaures@marshallip.com

28       spatel@marshallip.com

29       gnoland@marshallip.com

Interference 106,048

# ATTACHMENT

**From:** North, Christopher [mailto:christopher.north@bipc.com]
**Sent:** Wednesday, December 21, 2016 3:54 PM
**To:** BOX INTERFERENCES <BoxInterferences@USPTO.GOV>
**Cc:** Margolis, Paul D. <PMargolis@jenner.com>; Walters, Todd <todd.walters@bipc.com>; Bliss, Travis W. <travis.bliss@bipc.com>; Dunston, Erin M. <erin.dunston@bipc.com>; lrinlaures@marshallip.com; gnoland@marshallip.com; Sandip H. Patel (spatel@marshallip.com) (spatel@marshallip.com) <spatel@marshallip.com>; Roper, Harry J. (HRoper@jenner.com) <HRoper@jenner.com>; Trybus, Steven R. (STrybus@jenner.com) <STrybus@jenner.com>; Raymond N. Nimrod (raynimrod@quinnemanuel.com) <raynimrod@quinnemanuel.com>
**Subject:** Interference No. 106,048 (DK)

ATTENTION JUDGES KATZ, SCHAFER AND LANE

Your Honors:

Senior Party requests a conference call with the Board to request authorization to file evidence that became available after the close of briefing.  Specifically, Senior Party will request authorization to file two documents.

The first document is the Office Action issued in U.S. Patent Application No. 14/685,510 on November 17, 2016.  In this Office Action, the Examiner addresses a Reply that has been presented in this interference by Junior Party as Ex. 2422, and specifically the declaration of Cullen included therein that has been presented by Junior Party as Ex. 2406 and relied upon in, *e.g.*, in Broad Opposition 4, at page 28, lines 6-9, and slide 47 of Junior Party's demonstratives.

The second document is the Office Action issued in U.S. Patent Application No. 14/324,960 on November 23, 2016.   The '960 application was filed as a continuation of Junior Party's involved patents, including the involved '359 Patent.   In the Office Action, the Examiner addresses arguments that Junior Party has made in this interference.

Senior Party asserts that these documents could not have been presented prior to the close of briefing.

Junior Party opposes this request; Senior Party's request is untimely and improper.  If Senior Party thought that either the '510 (Toolgen) or the '960 (Rockefeller) file histories were relevant, arguments about those should have been made in its preliminary motions or oppositions.  If Senior Party believed the November Office Actions were relevant, it should have sought to introduce them when they became available a month ago.  Instead, Senior Party argued in its Motion 8 that third-party patent prosecution documents, including Exhibits 2406 and 2422, were irrelevant.

Moreover, Slide 47 was not used or relied on by Junior Party at the oral argument, and in any event, prior to oral argument, Junior Party requested Senior Party's objections to demonstratives so that Junior Party could act to remove any objections.   Senior Party did not provide such, stating that Senior Party

Interference 106,048

would "raise any objections to demonstratives during the 20 minutes provided to Senior Party for oral argument."  Senior Party did not raise any objection or mention this proposed new counter-evidence to the demonstrative at the hearing.  Additionally, Junior Party disputes Senior Party's contention that these office actions address arguments in the interference.

The Parties are available for a call at any time on Friday morning.

---

**Christopher North, PhD, Esq**
**Shareholder**

**Buchanan Ingersoll** & **Rooney PC**
1737 King Street, Suite 500
Alexandria, VA 22314-2727
703 838 6511 (direct voice)
703 836 6620 (office main)
703 836 2021 (fax)
BIPC.com  |  Bio  |  vCard

**Visit Buchanan PTAB Report**

---

KNOW GREATER PARTNERSHIP

CONFIDENTIAL/PRIVILEGED INFORMATION: This e-mail message (including any attachments) is a private communication sent by a law firm and may contain confidential, legally privileged or protected information meant solely for the intended recipient. If you are not the intended recipient, you are hereby notified that any use, dissemination, distribution or copying of this communication is prohibited and may be unlawful. Please notify the sender immediately by replying to this message, then delete the e-mail and any attachments from your system.

# EXHIBIT D

BoxInterferences@uspto.gov
Tel: 571-272- 7822

Filed: 14 September 2016

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD
_____

**THE BROAD INSTITUTE, INC.**, MASSACHUSETTS INSTITUTE
OF TECHNOLOGY, and PRESIDENT AND FELLOWS
OF HARVARD COLLEGE,
(Patents 8,697,359; 8,771,945; 8,795,965; 8,865,406; 8,871,445; 8,889,356;
8,895,308; 8,906,616; 8,932,814; 8,945,839; 8,993,233; 8,999,641
and Application 14/704,551),

**Junior Party**,

v.

**THE REGENTS OF THE UNIVERSITY OF CALIFORNIA,** UNIVERSITY
OF VIENNA, AND EMMANUELLE CHARPENTIER
(Application 13/842,859),

**Senior Party.**

Patent Interference No. 106,048 (DK)
_____

**ORDER – Additional Discovery and New Evidence in Reply
37 C.F.R. § 41.150(c) and Standing Order ¶ 122.6**

Before RICHARD E. SCHAFER, SALLY GARDNER LANE, and
DEBORAH KATZ, *Administrative Patent Judges*.

*Per curiam.*

1    Senior Party ("UC") was authorized to file a notice under 37 C.F.R.

2    § 41.120(a) stating the basis on which it would request subpoena of Shuailiang Lin

3    and George Church if authorized to file a motion.  (*See*  Paper 792.)  UC was also

4    authorized, in the same notice, to state the basis on which it would request

5    authorization to submit new evidence and testimony in response to Junior Party

6    ("Broad") Oppositions 3 and 4.  (*See* Paper 794.)  UC timely filed a notice. (*See*

7    Paper 795 ("Notice").  Broad was not authorized to file any papers regarding these

8    issues.

9                                    *Additional Discovery*

10    "The standard for granting requests [for additional discovery] is high and

11    requires specific bases for expecting that the discovery will be productive. Bd.R.

12    150(a) & (c)(1)."  Standing Order ("SO") ¶ 150.2.

13    UC asserts that it requires testimony from Dr. Lin to address Broad's

14    allegations in Broad Opposition 4 that the Jinek 2012 publication "triggered and

15    guided the work" of the Broad scientists and that the Broad scientists had

16    commenced their work in 2011.  (Notice, Paper 795, at 1:6-23, citing Broad Opp.

17    4, Paper 56, at 3:17-21.)  Similarly, UC argues that it requires testimony from Dr.

18    Church to address the challenge in Broad Opposition 4 on the issue of whether

19    research groups, particularly Dr. Church's group, "moved the Type-II CRISPR-

20    Cas system into eukaryotic cells before December 12, 2012."  (Notice, Paper 795,

21    at 1:24-2:18.)

22    UC Motion 4 (Paper 57) seeks to be accorded the benefit of priority of

23    earlier applications as constructive reductions to practice of the count.  UC fails to

24    explain why testimony from either Dr. Lin or Dr. Church regarding the timing of

25    actual work done by Broad scientists would be productive in regard to its

1    arguments regarding the disclosure of UC's earlier applications.  Thus, whether or

2    not the requested discovery would address Broad's specific arguments, UC has

3    failed to show that it would present a basis for discovery that would be productive

4    to the issues of its Motion 4.

5        In addition, UC does not direct us to any portion of Broad's oppositions

6    where testimony from fact witnesses is used to oppose UC's arguments.  Thus, it is

7    not clear why UC requires testimony from fact witness in reply.

8        UC also argues that if authorized to file a motion, it would show compelled

9    testimony is necessary to address Broad's objections to UC's evidence.  (Notice,

10   Paper 795, at 2:19-3:3.)  UC asserts that Broad has objected to certain exhibits

11   (Exhs. 1475, 1548, 1550-53, and 1559-60) as being impermissible hearsay, but UC

12   does not explain where these exhibits were relied upon or what arguments they

13   were used to support.  Without more explanation, we are not persuaded that

14   testimonial evidence would be productive in addressing objections to this evidence.

15   UC asserts that this evidence is "highly relevant evidence to determine whether

16   Broad's assertions are true." (Notice, Paper 795, at 3:8-10.)  Without any

17   explanation of how or where this evidence was used, UC has failed to show why at

18   this stage of the interference when priority is not yet at issue and given the motions

19   before us regarding benefit, substitution of the count, and interference-in-fact, such

20   testimony would be productive.

21       UC has not explained why there would be a sufficient basis for a motion for

22   additional testimony or for subpoena.  Accordingly, UC's request for such a

23   motion is DENIED.

*New Evidence and Testimony in Reply Briefs*

Under the Standing Order "declaration evidence shall not be submitted with a reply" without authorization.  SO ¶ 122.6.  UC requests authorization to present new declaration evidence with its replies regarding six issues.  (Notice, Paper 795, at 3:22-5:23.)

For each issue UC states that it disputes an allegation presented by Broad, but fails to explain why a new declaration is necessary to address it.  For example, in regard to the second through sixth issues, UC argues that it disputes Broad's assertions of how those of skill in the art would have understood certain facts or would have interpreted certain publications as explained by Broad's witnesses. UC does not explain why it cannot challenge Broad about these facts or publications with cross-examination of Broad's witnesses or by referring to contradictory portions of the cited documents.

UC has the burden of presenting a *prima facie* case for the relief it seeks in its motions.  37 C.F.R. § 41.121(b) ("The party filing the motion has the burden of proof to establish that it is entitled to the requested relief.")  "To be sufficient, a motion must provide a showing, supported with appropriate evidence, such that, if unrebutted, it would justify the relief sought."  37 C.F.R. § 41.208(b).  UC does not explain why relying on declaration evidence in its replies will show that it has met its burden in Motions 3 and 4.  Though UC argues that Broad presents new arguments and evidence in its oppositions, UC does not show that Broad presented these arguments and evidence for any other reason than to challenge the *prima facie* case in each of UC's motions.  If UC disputes these arguments and evidence, it is not clear why UC cannot address them with specific questioning of Broad's

-4-

1   witnesses to show the deficiencies or by showing that Broad's arguments lack

2   support or relevance.

3        In regard to the first issue, UC requests authorization to submit expert

4   testimony demonstrating that none of Broad's asserted best proofs meets the

5   requirement of either Count 1 or proposed Count 2. (Notice, Paper 795, at 4:7-15.)

6   Again, UC merely states that it disputes Broad's allegations, but does not provide

7   any explanation why new declaration testimony is needed in UC's reply. We note

8   further that UC states that the requested testimony would "demonstrate[e] that

9   none of Broad's alleged best proofs meet the requirements of either existing Count

10   1 or proposed Count 2." (Notice, Paper 795, at 4:13-15.) Whether or not Broad's

11   proofs are within the scope of Count 1 is an issue for priority, which is premature

12   at this point in the proceeding. UC has failed to explain why it needs additional

13   testimony to make its arguments about Broad's best proofs.

14        Accordingly, it is ORDERED that Broad is NOT AUTHORIZED to file a

15   motion regarding the submission of new declaration testimony with its reply briefs.


cc (via e-mail):


Attorneys for Junior Party Broad Institute:

     Steven R. Trybus
     Harry J. Roper
     Paul D. Margolis
     JENNER & BLOCK LLP
     strybus@jenner.com
     hroper@jenner.com
     pmargolis@jenner.com

Raymond N. Nimrod
QUINN EMMANUEL URQUHART & SULLIVAN, LLP
raynimrod@quinnemanuel.com

Attorneys for Senior Party University of California, et al.:

Todd R. Walters
Erin M. Dunston
Travis W. Bliss
BUCHANAN, INGERSOLL & ROONEY PC
todd.walters@bipc.com
erin.dunston@bipc.com
travis.bliss@bipc.com

Li-Hsien Rin-Laures
Sandip H. Patel
Greta Noland
MARSHALL GERSTEIN & BORUN LLP
lrinlaures@marshallip.com
spatel@marshallip.com
gnoland@marshallip.com

BoxInterferences@uspto.gov                                    Filed: 20 September 2016
Tel: 571-272- 7822

UNITED STATES PATENT AND TRADEMARK OFFICE
—————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD
—————————

**THE BROAD INSTITUTE, INC.**, MASSACHUSETTS INSTITUTE
OF TECHNOLOGY, and PRESIDENT AND FELLOWS
OF HARVARD COLLEGE,
(Patents 8,697,359; 8,771,945; 8,795,965; 8,865,406; 8,871,445; 8,889,356;
8,895,308; 8,906,616; 8,932,814; 8,945,839; 8,993,233; 8,999,641
and Application 14/704,551),

**Junior Party**,

v.

**THE REGENTS OF THE UNIVERSITY OF CALIFORNIA,** UNIVERSITY
OF VIENNA, AND EMMANUELLE CHARPENTIER
(Application 13/842,859),

**Senior Party.**

Patent Interference No. 106,048 (DK)
—————————

**ERRATA**

1        On 18 September 2016, the parties contacted the Board to request

2    confirmation that the Order entered 14 September 2016 (Paper 801) contained

3    certain errors.

4       It is ORDERED that the Order (Paper 801) is corrected to read at page 2,

5   lines 13-16: "UC asserts that it requires testimony from Dr. Lin to address Broad's

6   allegations in Broad Opposition 4 <u>in opposition to UC's argument</u> that the Jinek

7   2012 publication "triggered and guided the work" of the Broad scientists and that

8   the Broad scientists had commenced their work in 2011."

9       It is further ORDERED that the Order (Paper 801) is corrected to read at

10   page 5, lines 14-15: "Accordingly, it is ORDERED that ~~Broad~~ <u>UC</u> is NOT

11   AUTHORIZED to file a motion regarding the submission of new declaration

12   testimony with its reply briefs."


cc (via e-mail):


Attorneys for Junior Party Broad Institute:

    Steven R. Trybus
    Harry J. Roper
    Paul D. Margolis
    JENNER & BLOCK LLP
    strybus@jenner.com
    hroper@jenner.com
    pmargolis@jenner.com


    Raymond N. Nimrod
    QUINN EMANUEL URQUHART & SULLIVAN, LLP
    raynimrod@quinnemanuel.com

Attorneys for Senior Party University of California, et al.:

Todd R. Walters
Erin M. Dunston
Travis W. Bliss
Christopher L. North
BUCHANAN, INGERSOLL & ROONEY PC
todd.walters@bipc.com
erin.dunston@bipc.com
travis.bliss@bipc.com
christopher.north@bipc.com

Li-Hsien Rin-Laures
Sandip H. Patel
Greta Noland
MARSHALL GERSTEIN & BORUN LLP
lrinlaures@marshallip.com
spatel@marshallip.com
gnoland@marshallip.com

# EXHIBIT E

BoxInterferences@uspto.gov
Tel: 571-272- 7822                                Filed: September 1, 2016

UNITED STATES PATENT AND TRADEMARK OFFICE
————————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD
————————————

**THE BROAD INSTITUTE, INC.**, MASSACHUSETTS INSTITUTE
OF TECHNOLOGY, and PRESIDENT AND FELLOWS
OF HARVARD COLLEGE,
(Patents 8,697,359; 8,771,945; 8,795,965; 8,865,406; 8,871,445; 8,889,356;
8,895,308; 8,906,616; 8,932,814; 8,945,839; 8,993,233; 8,999,641
and Application 14/704,551),

**Junior Party**,

v.

**THE REGENTS OF THE UNIVERSITY OF CALIFORNIA,** UNIVERSITY
OF VIENNA, and EMMANUELLE CHARPENTIER
(Application 13/842,859),

**Senior Party.**

Patent Interference No. 106,048 (DK)
————————————

**ORDER**
**37 C.F.R. § 41.104(a)**

Before DEBORAH KATZ, *Administrative Patent Judge*.

1       On 30 August 2016, Senior Party ("UC") contacted the Board by e-mail to

2   request a conference call seeking authorization to submit new evidence and

1   testimony in response to arguments and evidence presented by Junior Party

2   Oppositions 3 and 4.  A conference call was not held.

3       It is ORDERED that UC may include a statement of the basis on which

4   it would request a motion for authorization to submit new evidence and

5   testimony under paragraph 122.6 of the Standing Order (Paper 2) in the notice

6   authorized in Paper 792.  No extension of the five-page limit or of the due date,

7   7 September 2016, of the authorized notice is provided.

8       UC is NOT AUTHORIZED to file evidence with this notice, but should

9   indicate the nature of the evidence, if any, it would rely upon if authorized to file a

10  motion.

11      UC is NOT AUTHORIZED to file any other papers and the Junior Party is

12  NOT AUTHORIZED to file any papers regarding this issue at this time.


Attachment: Exhibit (e-mail of 30 August 2016)


cc (via e-mail):

Attorneys for Junior Party Broad Institute:

> Steven R. Trybus
> Harry J. Roper
> JENNER & BLOCK LLP
> strybus@jenner.com
> hroper@jenner.com

2

Attorneys for Senior Party University of California, et al.:

> Todd R. Walters
> Erin M. Dunston
> Travis W. Bliss
> BUCHANAN, INGERSOLL & ROONEY PC
> todd.walters@bipc.com
> erin.dunston@bipc.com
> travis.bliss@bipc.com
>
> Li-Hsien Rin-Laures
> Sandip H. Patel
> Greta Noland
> MARSHALL GERSTEIN & BORUN LLP
> lrinlaures@marshallip.com
> spatel@marshallip.com
> gnoland@marshallip.com

# EXHIBIT

**From:** Walters, Todd [mailto:todd.walters@bipc.com]
**Sent:** Tuesday, August 30, 2016 8:08 PM
**To:** BOX INTERFERENCES <BoxInterferences@USPTO.GOV>
**Cc:** Steven R. Trybus (strybus@jenner.com) (strybus@jenner.com) <strybus@jenner.com>; Margolis, Paul D. (PMargolis@jenner.com) <PMargolis@jenner.com>; Roper, Harry J. (HRoper@jenner.com) <HRoper@jenner.com>; Sandip H. Patel (spatel@marshallip.com) <spatel@marshallip.com>; Li-Hsien (Lily) Rin-Laures, M.D. (lrinlaures@marshallip.com) <lrinlaures@marshallip.com>; Greta Noland <gnoland@marshallip.com>; Dunston, Erin M. <erin.dunston@bipc.com>; Bliss, Travis W. <travis.bliss@bipc.com>; Luttrell, Amy <amy.luttrell@bipc.com>
**Subject:** RE: Interference 106,048

Your Honor

Senior Party requests a telephone conference which can be combined with the conference requested on August 28, 2016 (see below).  Pursuant to Standing Order paragraph 122.6, Senior Party seeks leave to submit new evidence and testimony in response to arguments and evidence presented in Junior Party Oppositions 3 and 4.  If the Board does not wish a call, Senior Party requests permission to provide a submission to more fully address the merits of the request.  The Parties have conferred on this matter.  Junior Party objects to the requests made by Senior Party.  Both Parties are available for a call this week at the convenience of the panel.

Regards,

Todd Walters

4

EXHIBIT F

BoxInterferences@uspto.gov                           Filed April 15, 2016
Tel: 571-272-9797

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD
_____

**THE BROAD INSTITUTE, INC.**, MASSACHUSETTS INSTITUTE
OF TECHNOLOGY, and PRESIDENT AND FELLOWS
OF HARVARD COLLEGE,
(Patents 8,697,359; 8,771,945; 8,795,965; 8,865,406; 8,871,445; 8,889,356;
8,895,308; 8,906,616; 8,932,814; 8,945,839; 8,993,233; 8,999,641
and Application 14/704,551),

**Junior Party**,

v.

**THE REGENTS OF THE UNIVERSITY OF CALIFORNIA,** UNIVERSITY
OF VIENNA, AND EMMANUELLE CHARPENTIER
(Application 13/842,859),

**Senior Party.**

Patent Interference No. 106,048 (DK)
_____

Decision on Request for Rehearing of Order Authorizing Motions

37 C.F.R. § 41.125(c)

Before RICHARD E. SCHAFER, SALLY GARDNER LANE, and DEBORAH
KATZ, *Administrative Patent Judges*.

-1-

*Per curiam.*

Senior Party, The Regents of the University of California, University of Vienna, and Emmanuelle Charpentier ("UC"), filed Miscellaneous Motion 2 to request reconsideration of the Order Authorizing Motions ("Order," Paper 33). ("Request," Paper 39.)  Specifically, UC requests that we authorize it to file its Proposed Motion 1 and Proposed Motion 5, as listed in Senior Party List of Proposed Motions (Paper 27).

*Proposed Motion 1*

UC's Proposed Motion 1 would argue for judgment that all of Broad's involved patents are unpatentable over UC's involved '859 application/'797 publication.  (Paper 27, at 1-6.)  According to UC, all of Broad's patents are subject to the provisions of the America Invents Act and therefore Broad cannot antedate the filing date of UC's involved application and publication with testimony.  UC argues that this is a "threshold motion," which must be considered in the preliminary motions phase of the interference.

UC has not persuaded us that we overlooked or misapprehended anything in deferring consideration of whether to authorize its Proposed Motion 1.  We are still not persuaded that UC Proposed Motion 1 presents a "threshold issue."  As we indicated in our Order:

> Whether Broad's claims are unpatentable over prior art is not dispositive of issues of priority. The interference may proceed to determine if UC was not the first to invent the common subject matter under 35 U.S.C. § 102(g) even if Broad's claims were held not to be patentable. Because UC suggested the interference it chose to challenge Broad's claims in a priority contest instead of through another procedure. UC has not provided a sufficient reason why its

-2-

prior art challenge to Broad's claims should preempt the priority contest.

(Order, Paper 33, at 10.)  Though UC argues in its Request that Broad would lack standing if UC's proposed motions were granted, UC still fails to persuade us that it can avoid a priority determination under 35 U.S.C. § 102(g), even if Broad's claims are found to be unpatentable.

According to UC, its proposed motion addresses a standing issue because Broad allegedly chose to present claims that lack written description in a pre-AIA application.  UC argues that because the consequences of this choice are the same as for an involved application lacking written description support under 35 U.S.C. § 112, a threshold issue identified in 37 C.F.R. § 41.201, Broad lacks standing. (Request, Paper 39, at 3:8-14.)

This argument is not persuasive.  The interference rules provide examples of "threshold" issues, which, if proven, show that a party lacks standing.  The exemplary issues include whether an interference even exists (no interference-in-fact), whether a party presented interfering claims too late after notice of the other party's claims (35 U.S.C. § 135(b)), or whether an applicant presented interfering claims to subject matter it did not possess at filing (35 U.S.C. § 112, first paragraph).  *See* 37 C.F.R. § 41.201.  We are not persuaded that UC's attack on Broad's claims is analogous to these threshold issues.   UC does not show that this is a situation where an applicant "suggested or could have suggested" an interference and then presented interfering claims after notice of UC's claims.  As noted previously, even if Broad's claims were held to be unpatentable over the prior art, it would not necessarily deprive Broad of standing to establish that UC was not the first inventor of the subject matter of the count.  35 U.S.C. § 102(g)(1).

-3-

UC argues that "Broad pursued, and obtained issuance of, claims to which it is not entitled, thereby inducing this interference." (Request, Paper 39, at 5:1-4.) UC also argues that "this interference [was] forced upon [UC] by Broad" (*id.*, at 10:7-9). We are not persuaded that by pursuing and obtaining issued claims, Broad necessarily "suggested or could have suggested" an interference. Instead, UC suggested the interference and Broad requested, and received, authorization to argue that there is no interference-in-fact between the parties' claims. (Order, Paper 33, at 4-5.) In other words, it appears that Broad believes its claims and UC's claims are not in conflict.

UC cites to several non-precedential interference decisions to argue that authorizing Proposed Motion 1 would be consistent with long-standing Board practice. (Request, Paper 39, at 11:12-12:8; *see also id.* at 8:21-9:12.) We are not persuaded that non-precedential opinions from different proceedings, presented under different circumstances and with different facts, necessarily shed light on the current interference. Instead, an opinion from our reviewing court, cited by UC, demonstrates that the Board may use its discretion to decide whether to determine the patentability of a party's claims. *See McMullin v. Carroll*, 153 F. App'x 738, 746 (Fed. Cir. 2005) (unpublished) ("the Board's decision to terminate the interference without reaching the issue of the patentability of [junior party's] patents was based on the Board's determination, consistent with its regulations, that the dispositive issue was a threshold issue going to whether the interference was properly declared."). As further explained in that opinion,

> The Patent and Trademark Office has included written description as a threshold issue because of the "perception that some applicants would copy a claim simply to provoke interferences ... regardless of whether [they] had actually invented the same subject matter as the [opposing]

-4-

patentee had claimed." 69 Fed.Reg. 49960, 49991 (Aug. 12, 2004). Because the Board determined that McMullin's application lacked sufficient written description to support the claims on which the interference was based, the Board ruled that McMullin lacked standing and therefore dissolved the interference.

*Id.* at 745 (Fed. Cir. 2005).

In the absence of a reason why the interference should not have been declared, at this time we are not persuaded that a determination of priority should not be made, even if Broad's claims are determined to be unpatentable on the basis of prior art. Accordingly, we are not persuaded that we misapprehended or overlooked anything in regard to UC's assertion that its Proposed Motion 1 would resolve a threshold issue of Broad's standing. We note, in addition, that we did not deny authorization for UC's Proposed Motion 1, but deferred consideration of whether it is authorized. Therfore, if appropriate, UC may request authorization again before the priority phase of the interference, if such a phase is necessary.

UC argues further that we overlooked "the fact that a ruling on Senior Party's Proposed Motion 1 is essential in determining a Count that is directed to subject matter that is patentable to each party." (Request, Paper 39, at 6:25-7:7.) A count "means the Board's description of the interfering subject matter that sets the scope of admissible proofs on priority." 37 C.F.R. § 41.201. While the parties' claims inform the determination of the subject matter of the count, and may at times be identical to the count, a count is not a claim. A count must describe subject matter patentable over the prior art, but it does not have to be "patentable" in the sense of being supported by either party's specification. Neither party has a claim that is identical to the count. The determination of the patentability of Broad's claims based upon prior art would not require the count to be changed.

-5-

Accordingly, we are not persuaded that the patentability of Broad's claims must be determined in order to address the central issue of this proceeding—priority.

UC also argues that we overlooked that authorizing its Proposed Motion 1 at this stage of the proceeding would futher the Board's mandate to secure 'the just, speedy, and inexpensive resolution of every proceeding before the Board.'" (Request, Paper 39, at 9:18-11:11.)  According to UC, petitioning or requesting other procedures would be "an enormous waste of resources of both parties and the Board, given that the Board could, and should, effectively and efficiently address [the issues of Proposed Motion 1] in the current proceeding."  (*Id.*, at 10:9-12.)

Our mandate is for a just, speedy, and inexpensive resolution of priority issues.  *See* 35 U.S.C. § 135(a) ("The Patent Trial and Appeal Board *shall* determine questions of priority of inventions and may determine questions of patentability." (emphasis added)).  The motions that we authorized impact the determination of priority.  There may also be issues addressed in these motions that shed light on whether Broad's patent and application claims are unpatentable over the prior art and would aid the Board in any later consideration of these prior art patentability issues.  Accordingly, we are not persuaded that the most just, speedy, and inexpensive resolution of this proceeding requires authorization of UC Proposed Motion 1 at this time.

*Proposed Motion 5*

UC argues that we failed to address its Proposed Motion 5, which would argue that each of UC's involved claims should be designated as not corresponding to Count 1 and that a new claim, which does correspond to Count 1, should be added.  (Request, Paper 39, at 13:1-14:7.)  According to UC, this motion should be authorized because Count 1 encompasses two separate patentable inventions: "a

single-molecule DNA-targeting RNA" and "a double-molecule format."[1]  (*Id.*, at 13:12-17.)

We agree with UC's characterization of this motion as a means of arguing that the current count is improper.  To allow UC to address its concern, we authorized it to argue the merits of what it proposes as the proper count between the parties' current claims in a single motion.  UC suggested an interference between its currently pending claims and Broad's claims.  Thus, it is not clear why UC would need to cancel its claims and add a new claim.

*Conclusion*

After consideration of UC's arguments, the request for rehearing and reconsideration of the Order is *denied*.

---

[1] UC argues in its Request and in its list of proposed motions that the separate patentability was recognized by the Office in a restriction requirement issued by the examiner.  (Request, Paper 39, at 13:17-19.)  We do not consider an examiner's restriction requirement to be evidence that inventions are separately patentable or that subject matter cannot be included in one count.  *See Applied Materials, Inc. v. Advanced Semiconductor Materials America, Inc.,* 98 F.3d 1563 (Fed. Cir. 1996) (explaining that restriction requirements are made for the purpose of "examination convenience," not as a final determination on the subject matter claimed).

cc (via e-mail):


Attorneys for Junior Party Broad Institute:

     Steven R. Trybus
     Harry J. Roper
     JENNER & BLOCK LLP
     strybus@jenner.com
     hroper@jenner.com


Attorneys for Senior Party University of California, et al.:

     Todd R. Walters
     Erin M. Dunston
     Travis W. Bliss
     BUCHANAN, INGERSOLL & ROONEY PC
     todd.walters@bipc.com
     erin.dunston@bipc.com
     travis.bliss@bipc.com

     Li-Hsien Rin-Laures
     Sandip H. Patel
     Greta Noland
     MARSHALL GERSTEIN & BORUN LLP
     lrinlaures@marshallip.com
     spatel@marshallip.com
     gnoland@marshallip.com

# EXHIBIT G

BoxInterferences@uspto.gov                          Filed:17 March 2016
Tel: 571-272-9797

UNITED STATES PATENT AND TRADEMARK OFFICE
————————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD
————————————

**THE BROAD INSTITUTE, INC.**, MASSACHUSETTS INSTITUTE
OF TECHNOLOGY, and PRESIDENT AND FELLOWS
OF HARVARD COLLEGE,
(Patents 8,697,359; 8,771,945; 8,795,965; 8,865,406; 8,871,445; 8,889,356;
8,895,308; 8,906,616; 8,932,814; 8,945,839; 8,993,233; 8,999,641;
and Application 14/704,551),

**Junior Party**,

v.

**THE REGENTS OF THE UNIVERSITY OF CALIFORNIA,** UNIVERSITY
OF VIENNA, AND EMMANUELLE CHARPENTIER
(Application 13/842,859),

**Senior Party.**

Patent Interference No. 106,048 (DK)
————————————

**ORDER – Authorizing Motions and Setting Times**

**37 C.F.R. § 121**

Before RICHARD E. SCHAFER, SALLY GARDNER LANE, and
DEBORAH KATZ, *Administrative Patent Judges*.

*Per curiam.*

1      A conference call was held on 10 March 2016 at approximately 1:00 p.m. to

2  discuss the parties' proposed motions.  Steven Trybus, Harry Roper, Paul

3  Margolis, Danny Huntington, Jill Browning, Elizabeth Spar, Timothy Murphy, and

4  Lawrence Green represented Junior Party Broad Institute, Inc., Massachusetts

5  Institute of Technology, and President and Fellows of Harvard College ("Broad").

6  Todd Walters, Brian Fairchild, Erin Dunston, and Travis Bill represented Senior

7  Party the Regents of the University of California, University of Vienna, and

8  Emmanuelle Charpentier ("UC").  Administrative Patent Judges Richard Schafer,

9  Sally Lane, and Deborah Katz were present for the Board.  A court reported

10  transcribed the conference.  (*See* Transcript, Paper 31.)

11      As required by the Declaration (Paper 1 at 2), the parties filed notices of the

12  basis upon which they will request relief during the interference.  *See* 37 C.F.R.

13  § 204(b).  Specifically, Broad filed Paper 26 and UC filed Paper 27.

14      Several of the motions suggested by the parties relate to matters that will

15  impact the priority contest, such as whether an interference exists between the

16  parties' claims, the earliest benefit date that should be accorded to the parties, the

17  claims that properly correspond to the count, etc.  Though these matters were given

18  preliminary consideration in declaring the interference, the Notice of Declaration is

19  not the result of a complete review of the file histories and prosecution of the

20  involved files by the Board.  The Board does not reexamine the patents and

21  applications the examiner believes interfere.  Because the Notice of Declaration

22  reflects a preliminary determination, substantive motions may be authorized to

23  change the original status quo of the interference.  Substantive motions may also

24  be filed attacking the patentability of an opponent's involved claims.  All motions

25  however, must be authorized before filing.  37 C.F.R. § 41.121(a).  Pre-

1   authorization furthers the Director's goal "to secure the just, speedy, and

2   inexpensive resolution of every proceeding before the Board."  37 C.F.R.

3   § 41.1(b).  Pre-authorization is also consistent with the Board's discretion to reach

4   patentability issues: "The [Patent Trial and Appeal Board] shall determine priority

5   and may determine questions of patentability.  35 U.S.C. § 135(a) (2009).

6   Although patentability issues may be resolved, the Board need not authorize

7   patentability motions that do not impact the determination of priority.  In other

8   words, an interference is not a substitute for *ex parte* reexamination or other PTO

9   patentability proceedings.

10       Certain issues have been characterized in the rules as "threshold issues."  37

11   C.F.R. § 41.201.  Threshold issues are specifically defined: "Threshold issue

12   means an issue that, if resolved in favor of the movant, would deprive the opponent

13   of standing in the interference." *Id.*  The rules provide three situations that <u>may</u>

14   deprive an opponent of "standing."

15       The first is no interference-in-fact.  A holding of no interference in-fact

16   means that none of a party's claims meet the "two-way" test for the existence of an

17   interference under 37 C.F.R. § 41.203(a).  Under such circumstances, no one has

18   standing to proceed because the parties are not claiming interfering subject matter.

19       The second and third examples relate to claims added to an opponent's

20   application after the "movant's" application was published or its patent issued.  If

21   the interfering claims were added, e.g., copied, more than a year after the

22   publication or patenting, subject to certain exceptions, 35 U.S.C. § 135(b)(1) and

23   (2) precludes the copier from having the interfering claim in its application.  Thus

24   the copier is precluded by the statute from standing to participate in an

25   interference.

1    Another example relates to claims the opponent added, e.g. copied, seeking

2    an interference, where those claims lacked written description support.  Under

3    these circumstances, a holding that none of the opponent's added claims have

4    written descriptive support deprives the opponent of standing because the

5    opponent's original written description does not demonstrate possession of the

6    subject matter added to provoke an interference.  It would be unfair to allow such

7    unsupported claims to form the basis for an attack on the movant's claimed subject

8    matter.

9    Patentability over the prior art is not now, and never has been, a "threshold

10   issue."  A completion of examination and the determination by an examiner that

11   the claims are patentable to every potential party is ordinarily a prerequisite to an

12   examiner suggesting that an interference be declared.  However, a holding during

13   the course of interference that a party's claims are unpatentable over prior art does

14   not deprive that party of standing on the central issue of an interference—priority.

15   A party whose claims have been held unpatentable may still have a basis to show

16   the opponent is not entitled to a patent because the opponent was not the first to

17   invent the interfering subject matter.  If that party establishes it was the first to

18   invent the subject matter, the opponent is barred from obtaining a patent by 35

19   U.S.C. § 102(g).

20

21   *I.    Broad's Proposed Motions*

22   <u>Proposed Motions 2-13</u>[1]: Broad requests authorization to file a motion or

23   motions arguing that there is no interference-in-fact between UC's involved claims

24   and its involved claims.  (*See* Paper 26, at 1:8-2:13.)

---

[1] Because Broad previously filed Miscellaneous Motion 1 (Paper 25), the

4

1    Authorization for this motion is GRANTED.  Broad may file one motion,

2  entitled "BROAD et al. SUBSTANTIVE MOTION 2" to argue that the parties'

3  claims do not interfere.

4

5    Proposed Motions 14-46: Broad requests authorization to file motions

6  arguing that it should be accorded the benefit of priority in regard to Count 1 for

7  prior provisional and non-provisional applications.  (*See* Paper 26, at 2:15-4:17.)

8    We note that Broad lists the applications that became its 12 involved patents.

9  (*See* Broad List, Paper 26, at 3:14, 3:33 and 3:21-4:7, applications B17, B20, B24-

10  B46.)  Benefit to these applications has already been accorded to Broad based on

11  the involvement of the patents that issued from these applications.  Therefore,

12  Broad's argument need not refer to them.

13    Broad also lists 16 provisional applications.  A constructive reduction to

14  practice is "a described and enabled anticipation under 35 U.S.C. § 102(g)(1) in a

15  patent application of the subject matter of a count."  37 C.F.R. § 41.201 (definition

16  of "[c]onstructive reduction to practice.")  Accordingly, each provisional

17  application for which benefit is sought must be shown to describe and enable an

18  anticipation of the count subject matter.  Benefit will be accorded to only one

19  provisional application.

20    Authorization for this motion is GRANTED.  Broad may file one motion

21  entitled "BROAD et al. SUBSTANTIVE MOTION 3" to argue that benefit of the

22  filing date of one or more earlier applications should be accorded to Broad as a

23  construction reductions to practice of the subject matter of the count.  Briefing is

---

numbering of its proposed motions begins at two.  (*See* Broad List, Paper 26, at
1:4-5.)

1   limited to arguments regarding no more than **four** provisional applications.  This

2   motion must include a chart for each application argued to be a constructive

3   reduction to practice, with two columns: (1) a column reciting the elements of the

4   count and (2) a column providing only citations to the asserted disclosure in the

5   specification of the earlier application.  The chart shall not include any argument or

6   information beyond the count elements and citations.

7

8       Proposed Motion 47:  Broad requests authorization for a motion to argue

9   that UC's claims are unpatentable under 35 U.S.C. § 112, first paragraph, for lack

10  of written description.  (*See* Paper 26, at 4:21-6:23.)

11      Authorization for this motion is GRANTED.   Broad may file one motion

12  entitled "BROAD et al. SUBSTANTIVE MOTION 4."  This motion appears to

13  address a threshold issue.  That is, if the motion is granted, judgment may be

14  entered against UC because it might lack standing in the interference.  *See* 37

15  C.F.R. § 41.201 (definition of threshold issue, wherein a threshold issue may be

16  "[i]n the case of an involved application claim first made after . . . issuance of the

17  movant's patent . . . .")  UC's involved claims were first filed after the issuance of

18  a patent to Broad in order to suggest the interference (*see* Application 13/842,859,

19  Suggestion for Interference Pursuant to 37 C.F.R. § 41.202, filed 13 April 2015 (p.

20  1: "Applicants respectfully request that an interference be declared involving

21  Claims 165-247 of U.S. Patent Application No. 13/842,859 . . ., which are

22  concurrently filed herewith in an Amendment and Reply.")).  Though counsel for

23  UC argued that this motion is not threshold because UC may request authorization

24  to file a responsive motion to amend its claims, the issue of standing does not turn

25  on the possibility of filing a responsive motion.  For example, the grant of a motion

1   for lack of written description and the denial of the opponent's responsive motion

2   to add a supported claim would still result in a judgment for lack of standing.  The

3   responsive motion could be denied because the proposed claim was also not

4   supported or was otherwise not shown to be patentable.

5

6       Proposed Motion 48: Broad requests authorization for a motion to argue that

7   UC's claims are unpatentable under 35 U.S.C. § 112, first paragraph, for lack of an

8   enabling description for the full scope of the claimed subject matter.  (*See* Paper

9   26, at 7:1-8:2.)  Consideration of whether this motion will be authorized is

10  DEFERRED.  While this proposed motion would address the patentability of UC's

11  claims, it does not appear to impact the priority contest.  Priority is determined

12  based upon the count or counts.  A "count," as distinguished from a party's

13  "claim," need not be patentable to either party in the sense of being fully supported

14  by either party's disclosure.  *Squires v. Corbett,* 560 F.2d 424, 433 (CCPA 1977).

15  Additionally, priority proofs need not establish invention of the full scope of the

16  claimed subject matter.  Proof of a sole embodiment meeting all the limitations of

17  the count is sufficient.  Therefore, whether or not the UC disclosure enables the

18  full scope of its claims, is not necessarily informative of whether UC can provide

19  proof of invention of an embodiment within the scope of the count.

20

21      Proposed Motions 49-50:  Broad requests authorization to file motions to

22  argue that UC's claims are unpatentable over certain prior art.  (Paper 26, at 8:3-

23  9:3 and 9:4-10:11.)  Consideration of whether the motions will be authorized is

24  DEFERRED.    Broad indicates that the references cited are prior art to the UC

7

1    application under 35 U.S.C. § 102(a) or (e).  It is not apparent how the patentability

2    over the prior art would impact the priority determination.

3

4    　　　　Proposed Motions 51-56: Broad argues that certain of its claims should not

5    have been designated as corresponding to Count 1 because they are not anticipated

6    or rendered obvious by Count 1.  (*See* Paper 26, at 10:13-12:9.)

7    　　　　Authorization for this motion is GRANTED.  Broad may file one motion

8    entitled "BROAD et al. SUBSTANTIVE MOTION 5" to argue that certain claims

9    do not correspond to the count.

10

11   　　　　Proposed Miscellaneous Motion 57:  Broad makes several requests

12   regarding currently pending, but uninvolved applications.  First, Broad requests

13   that it be "allow[ed]" access to the prosecution histories of UC's pending,

14   unpublished applications reportedly related to UC's currently involved application.

15   (Paper 27, at 12:12-19.)

16   　　　　This request is DENIED as Broad has not provided sufficient reason why we

17   should order UC to provide Broad access to the file history of an application that is

18   not involved in the interference.

19   　　　　However, we GRANT Broad's second request, which is that UC keep Broad

20   and the Board apprised on the issuance of any notice of allowance for any claim in

21   applications 14/942,782, 14/685,516, 14/685,514, 14/685,513, 14/685,504, and

22   14/685,502.  If appropriate, Broad may renew its request for access if and when

23   allowable subject matter is indicated.

24   　　　　It is ORDERED that **both parties** provide updated notices of related

25   proceedings when a notice of allowance is issued or other relevant action,

1    including that an application has become publically available, occurs in any

2    involved or related application or patent.  The parties are also required to provide

3    notice of any other proceeding relevant to the patents, applications, or parties in the

4    interference.

5         Third, Broad requests that UC be required to advise the examiner in these

6    and any other UC related applications of the existence of the interference.  This

7    request is GRANTED.

8         It is ORDERED that **both parties** advise the examiner of other related

9    applications of the interference.  We note that the examiner of the currently

10   involved application has notice of the interference already.

11

12        Proposed Priority Motion 58: Consideration of whether Broad's proposed

13   motion for judgment based on priority (*see* Paper 26, at 13:2) will be authorized is

14   DEFERRED to the priority phase of the interference, if one is necessary.

15

16        *II.     UC's Proposed Motions*

17        Proposed Motion 1: UC requests a motion to argue that all of Broad's

18   involved claims are unpatentable over the publication of UC's involved '859

19   application, which is allegedly prior art to Broad's involved claims.  (Paper 27, at

20   1:6-6:20.)   UC indicates that it would argue Broad's claims are subject to the AIA

21   prior art provisions and, thus, Broad cannot assert an earlier date of invention to

22   overcome the date of UC's disclosures.

23        Consideration of whether this motion will be authorized is DEFERRED.

24   Though UC characterized this motion as threshold, it relates only to whether

25   Broad's claims are unpatentable over the prior art, not whether Broad has standing

1    in the interference.  Whether Broad's claims are unpatentable over prior art is not

2    dispositive of issues of priority.  The interference may proceed to determine if UC

3    was not the first to invent the common subject matter under 35 U.S.C. § 102(g)

4    even if Broad's claims were held not to be patentable.  Because UC suggested the

5    interference it chose to challenge Broad's claims in a priority contest instead of

6    through another procedure.  UC has not provided a sufficient reason why its prior

7    art challenge to Broad's claims should preempt the priority contest.

8

9        <u>Proposed Motions 2-6</u>: UC requests authorization for five motions to

10   substitute Count 1 with proposed counts.  (Paper 27, at 7:2-15:2.)  UC requests that

11   consideration of Proposed Motions 3-6 be contingent on the denial of other

12   proposed motions.  UC's requests amount to serial attempts to change the count.

13       Authorization for this motion is GRANTED to the extent indicated below.

14   In the interest of a just, speedy, and inexpensive resolution of the interference, *see*

15   37 C.F.R. § 41.1(b), UC may file **one** motion proposing that Count 1 be substituted

16   with one count that UC will argue best describes the interfering subject matter and

17   sets the scope of admissible proofs in a way that is just to both parties.  UC may

18   alternatively propose two counts if both are necessary to describe the interfering

19   subject matter of two separately patentable inventions.  UC may not propose two

20   counts that are alternate to each other.  The motion shall be entitled "UC et al.

21   SUBSTANTIVE MOTION 1."

22

23       <u>Proposed Motion 7</u>: UC requests authorization to file a motion arguing that

24   it should be accorded the benefit of priority of the filing date of its provisional

1    applications as a constructive reduction to practice of Count 1 or of Proposed

2    Counts 2-5.  (Paper 27, at 15:4-16.)

3         Authorization for this motion is GRANTED.  The motion shall be filed as

4    one paper, entitled "UC et al. SUBSTANTIVE MOTION 2."  This motion must

5    include a chart for each application argued to be a constructive reduction to

6    practice, with two columns: (1) a column reciting the elements of the count and (2)

7    a column providing citations to the asserted disclosure in the specification of the

8    earlier application.  The chart shall not include any argument or other information

9    beyond the count elements and citations.

10

11        Proposed Motion 8: UC requests authorization to file a motion arguing that

12   Broad's involved claims are anticipated by the publication of UC's involved

13   application and/or is rendered obvious by the publication in combination with other

14   prior art.  (Paper 27, at 15:18-19:16.)

15        Consideration of whether this motion will be authorized is DEFERRED.

16   Whether Broad's claims are unpatentable over prior art is not determinative of

17   issues of priority and the interference may proceed even if Broad's claims are not

18   patentable.

19

20        Proposed Motion 9: UC requests authorization to file a motion arguing that

21   each of Broad's patents are unpatentable under the doctrine of obviousness-type

22   double-patenting.  (Paper 27, at 19:17-25:7.)  UC would argue that the terminal

23   disclaimers filed by Broad to overcome rejections under the doctrine of

24   obviousness-type double-patenting are ineffective because not all of the patents are

25   commonly owned.

1    Consideration of whether this motion will be authorized is DEFERRED.  It

2    is not apparent that the double patenting issue will impact the priority

3    determination and the interference may proceed even if Broad's claims were held

4    not to be patentable.

5

6    Proposed Motion 10: UC requests authorization for a motion to argue that

7    each of Broad's involved patents are unpatentable for lack of proper inventorship.

8    (Paper 27, at 25:8-30:7.)

9    Consideration of whether this motion will be authorized is DEFERRED.

10   The issues that UC indicates it will argue may overlap with the issues of priority.

11   Thus, the most just, speedy, and inexpensive resolution of this interference would

12   be to address these issues along with priority, if at all.

13

14   Proposed Motion 11: UC requests authorization to file a motion arguing that

15   Broad's patents were obtained through inequitable conduct with respect to the

16   filing of certain declarations under 37 C.F.R. §§ 1.131 and 1.132.  (Paper 27, at

17   30:8-31:12.)  UC asserts that Broad's inventors never had or made use of

18   tracrRNA –said to be an essential element of the claimed subject matter – in any of

19   the submitted experimental data and results.  (Paper 27 at 31:3-5.)  Whether or not

20   tracrRNA is an essential element of the interfering subject matter will likely be

21   apparent from the priority proofs.  Authorizing the requested motion at this time is

22   premature.  Authorization for UC's proposed motion is DENIED.  UC may request

23   authorization to file its motion after the conclusion of the priority phase of the

24   interference.

1    During the conference call, Broad asked that UC be required to file a

2    substitute list of proposed motions, deleting the request for this motion because the

3    request is inappropriate.  No change to Senior Party List of Proposed Motions

4    (Paper 27) is ordered.  Although there is not sufficient basis for the proposed

5    motion at this time, no determination of the facts, or lack thereof, that would

6    support the proposed motion has been made.

7

8    <u>Miscellaneous Issues</u>:

9    UC requested guidance on Broad application 14/704,551, which reportedly

10   was included in UC's suggestion for interference and reportedly has been allowed

11   by the examiner.  (*See* Paper 27, at 31:18-32:8.)  This application has been added

12   to the interference.  (*See* Redeclaration, Paper 32.)  The parties are authorized to

13   address application 14/704,551 in the briefing for the following motions:

14   Broad Substantive Motion 2, arguing that there is no interference-in-fact;

15   Broad Substantive Motion 5, arguing that certain claims do not correspond

16           to the count; and

17   UC Substantive Motion 1, arguing for substitution of the count.

18   *III.    Other Matters*

19   The requirement for statements of material facts is not waived in this

20   interference.  *See* 37 C.F.R. § 41.121(d).  Such statements are included in the page

21   limits set for each brief.  *See, e.g.,* SO ¶ 121.2.

22   Where required or otherwise helpful to presenting a party's case, claim

23   charts may be included in the briefs.  Claim charts do not count towards the page

24   limits.

13

1    In regard to both statements of material facts and claim charts, the parties are

2    reminded that neither are a substitute for the appropriate argument and explanation

3    in a paper. *See, e.g.*, 37 C.F.R. § 41.121(e).

4    The parties have both asked that the page limits for their motions be

5    extended. At this time, the page limits provided in the Standing Order are not

6    changed. The parties are encouraged to organize their briefs so that arguments

7    common to multiple applications or patents be discussed together. If in preparing

8    their briefs, the parties have difficulty abiding by these limits for a specific reason,

9    they may arrange a conference call to request additional pages. The parties are

10   encouraged to communicate with each other and to come to mutually agreeable,

11   reasonable request when requesting additional pages so that the page limits can be

12   adjusted equally for both.

13   The parties have also requested an extended schedule for briefing in the first

14   phase of the interference. The schedule will adhere to a normal interference

15   schedule at this time. *See* SO, Appendix of Forms, Form 2. As with extensions of

16   page limits, if, after stipulating to changes in Time Periods 1-6 (*see* Section VI.A,

17   below), the parties find that they require extra time for a specific reason, they may

18   request a conference call to seek an extension.

19       IV.    *Schedule*

20           **A. Time Periods Associated with Motions**

21   The TIME PERIODS described below are set out in an Appendix to this

22   ORDER. Action specified for each TIME PERIOD must be completed by the date

23   specified for the TIME PERIOD.

24   The parties are authorized to stipulate different times (earlier or later, but not

25   later than TIME PERIOD 7) for TIME PERIODS 1 through 6. A notice of the

14

1  stipulation must be promptly filed.  The notice must be in the form of a copy of the

2  Appendix attached to this ORDER with old dates crossed out and new dates

3  inserted by hand.  <u>The parties may not stipulate an extension of TIME PERIOD 7</u>

4  <u>or the default date for oral argument</u>.  In stipulating different times, the parties

5  should consider the effect of the stipulation on times: (1) to object to evidence (5

6  business days, Bd.R. 155(b)(1)), (2) to supplement evidence (10 business days,

7  Bd.R. 155(b)(2)), (3) to begin cross examination (no earlier than 21 days after

8  service, SO ¶ 157.3.1) and (4) to conclude cross examination (at least 10 days

9  before the opposition or reply is due, SO ¶ 157.3.2).

10  The parties should note that exhibits are no longer filed at the end of the

11  schedule, but should be filed when served on the other party. An exhibit, including

12  an affidavit, cited in connection with a motion, opposition, reply, or affidavit, must

13  be served and filed with the motion, opposition, reply or affidavit in which the

14  exhibit is first mentioned. Exhibits should not be filed more than once. Parties

15  should also note that a single pdf file size greater than 25 MB will need to be

16  divided into smaller pdf files.

17  Transcripts of cross examinations and depositions taken under 35 U.S.C.

18  § 24 must be served and filed when the other exhibits in connection with a motion,

19  opposition, or reply are filed.

20  TIME PERIOD 1

21  File all authorized motions.

22  If no party files a motion, the SENIOR PARTY must arrange a conference

23  call with the parties and the Board so that appropriate adjustments to the schedule

24  may be made.

15

TIME PERIOD 2

File any responsive motions (Bd.R. 121(a)(2)) in response to an opponent's motion filed during TIME PERIOD 1.

TIME PERIOD 3

File oppositions to all motions, including responsive motions.

TIME PERIOD 4

File replies to all oppositions.

TIME PERIOD 5

a. File any request for oral argument on motions,

b. File motions to exclude evidence (Bd.R. 155(c); SO ¶ 155.2), and

c. File observations on cross examination (SO ¶ 157.7) of reply testimony.

TIME PERIOD 6

a. File oppositions to an opponent's motion to exclude evidence and

b. File any response to observations.

TIME PERIOD 7

File replies to oppositions to motions to exclude evidence.

**B. Priority Statements**

1. At TIME PERIOD 1, file <u>but do not serve</u> a priority statement (Bd.R. 120; Bd.R. 204(a)).

2. When filing the priority statement, the filer may use the "Confidential" setting for the Public Access status.

16

3. A junior party who does not file a priority statement shall not have access to the priority statement of any other party.

4. **One (1) business day** after TIME PERIOD 1, serve a copy of the priority statement upon each opponent (except for a junior party barred under D.3 above).

### C. Filing Exhibits

A document larger than 25MB cannot be filed online. If a party needs to file a document larger than 25MB, unless otherwise instructed by order, please contact the board at the telephone number above to make other arrangements, such as sending a CD-ROM by Express Mail.

### D. Default Oral Argument Date

If a request for oral argument (Bd.R. 124(a); TIME PERIOD 5) is granted, the default date for such argument is the date provided in the appendix below.  No oral argument will occur if either no argument is requested or granted.

cc (via e-mail):

Attorney for Junior Party Broad Institute:

Steven R. Trybus
Harry J. Roper
JENNER & BLOCK LLP
strybus@jenner.com
hroper@jenner.com

Attorney for Senior Party University of California, et al.:

Todd R. Walters
Erin M. Dunston
Travis W. Bliss
BUCHANAN, INGERSOLL & ROONEY PC
todd.walters@bipc.com
erin.dunston@bipc.com
travis.bliss@bipc.com

Brian A. Fairchild
Carmella L. Stephens
GOODWIN PROCTER LLP
bfairchild@goodwinprocter.com
CStephens@goodwinprocter.com

APPENDIX--ORDER - RULE 123(a)
(Times for substantive motions; priority deferred)

Interference 106,048

TIME PERIOD 1 ................................................................... **22 April 2016**
    File motions
    File (but serve one business day later) priority statements

TIME PERIOD 2 ...................................................................**13 May 2016**
    File responsive motions to motions filed in TIME PERIOD 1

TIME PERIOD 3 ................................................................... **24 June 2016**
    File oppositions to all motions

TIME PERIOD 4 ................................................................... **5 August 2016**
    File all replies

TIME PERIOD 5 ........................................................ **16 September 2016**
    File request for oral argument
    File motions to exclude
    File observations

TIME PERIOD 6 .............................................................**7 October 2016**
    File oppositions to motions to exclude
    File response to observations

TIME PERIOD 7 ...........................................................**21 October 2016**
    File replies to oppositions to motions to exclude

DEFAULT ORAL ARGUMENT DATE ...................................**17 November 2016**
    Default oral argument date (if ordered)

19